# THE STATE v. SPEYER, Appellant.

### Division Two, May 31, 1904.

1. **UNVERIFIED INFORMATION: No Motion to Quash.** Where no motion to quash the information is filed in the trial court the fact that it was not verified by oath or supported by affidavit can not be considered on appeal.

2. **CRIMINAL INTENT: Inference: Presumption.** Without a criminal intent there can be no felony, but he who commits the offense is presumed to intend the natural and necessary and probable consequences of what he intentionally does.

3. ——: ——: ——: **How Overcome.** The act of a defendant in intentionally killing his child with a deadly weapon, is presumptively murder, unless at the time he committed the act his reason and mental powers were so deficient that he had no conception of the right or wrong of the act he was about to commit.

4. **INSTRUCTION: Capacity for Deliberation and Premeditation.** An instruction should not draw a distinction between defendant's mental capacity to deliberate and his capacity to premeditate. It should not, in effect, tell the jury that defendant might be so insane that he could not be guilty of murder in the first degree, and yet sane enough to premeditate and therefore might be guilty of murder in the second degree.

5. ——: ——: **Instruction In Second Degree: Case Stated.** The court instructed the jury that "if they fail to find a verdict" in accordance with an instruction on murder in the first degree, "but shall find and believe from the evidence that defendant willfully, feloniously and premeditatedly and with malice aforethought intentionally cut the throat of" his five-year-old son, "and that immediately before such act the defendant had been placed under arrest charged with a crime, and that threats of lynching had been made in his presence, and demonstrations which led him to believe that he was in imminent danger of being immediately hanged, and such belief, coupled with the fear of leaving his son alone in the world, suddenly arrested his powers of reflection to such an extent that, at the time and immediately before he struck the homicidal blow he was incapable of deliberation, and in fact did not deliberate, then you will find him guilty of murder in the second degree," unless "defendant was insane," etc. *Held*, to be error, since if the defend-

ant could not deliberate he could not premeditate. *Held*, also if defendant was incapable of deliberation, he was incapable of committing murder in any degree.

6. ——: ——: **Meaning of Reflection.** The word "reflection" as used in this instruction means, judging rationally; power to understand the right from the wrong of the act about to be committed.

7. ——: **Requested by Defendant.** The fact that defendant requested the court to give an instruction on murder in the second degree, did not cure an incorrect instruction given by the court of its own motion.

Appeal from Jackson Circuit Court.—*Hon. Jno. W. Wofford*, Judge.

REVERSED AND REMANDED.

*W. F. Riggs* for appellant.

(1) Can a more horrible insane condition of mind be imagined than that of a person so affected by fright as to be unconscious of his own acts or state? So affected as to be incapable of deliberation? Each and every author on psychology, on mental diseases, and on medical jurisprudence recognizes and affirms, and the many horrible catastrophes attest, that "fright" is a most efficient cause of an insane condition of mind. If the court may eliminate insanity caused and produced by fright, then what avails insanity caused and produced by traumatic injury or disease? Excessive pain or sorrow, pleasure or joy, can entirely prevent thought from taking place. 3 Witthaus & B., Med. Juris., 181. Fear or terror following a criminal assault, or the shock from exposure to some great danger, may cause insanity. 3 Witthaus & B., Med. Juris., 198. (2) If defendant's powers of reflection were suddenly arrested so as to render him incapable of deliberation, how could the act be willful or malicious? State v. McKenzie, 102 Mo. 629; State v. Kotovsky, 74 Mo. 247. (3) There can be no murder in the second degree without premedi-

tation. State v. Robinson, 73 Mo. 306; State v. Erb, 74 Mo. 199; State v. Lewis, 74 Mo. 222; State v. Harris, 76 Mo. 361.

*Edward C. Crow,* Attorney-General, and *C. D. Corum* for the State.

Defendant complains because the court instructed the jury as to murder in the second degree. It seems that the complaint does not arise because of any vice in the instruction itself, but because an instruction on that degree of the offense should not have been given at all. This position is taken on the ground that there can be no degrees of mental accountability. We think that the facts fully justify the court in giving an instruction on murder in the second degree, but, however that may be, appellant is not in condition to complain of the action of the court in giving the instruction, since the record shows that he asked for such an instruction.

GANTT, P. J.—From a conviction of murder in the second degree in the criminal court of Jackson county, the defendant appeals.

The account of the killing of his little son, only five years old, by the defendant is in the highest degree tragical.

There is practically little or no controversy as to the facts of the case. The defendant at the time of the homicide was a married man. His family consisted of his wife and two children. Defendant was about thirty-three years old. At and prior to the time of the homicide, upon which this prosecution is based, the defendant was engaged in giving equestrian exhibitions and at this particular time was engaged by the Karnival Krew Association of Kansas City and was giving performances in said city. His wife and little daughter, about eight years of age, were living in New Orleans, Louisiana.

His little son, Freddie Speyer, accompanied his father, and also gave exhibitions of his skill in handling horses. It seems these exhibitions by father and son were given in a tent.

On the sixteenth of July, 1902, and during the carnival, the defendant was standing in front of the tent in which he and his little boy gave their exhibitions, and was announcing that the show would soon begin and was endeavoring to get the crowd to patronize the performances, when Sergeant Martin and officer Jadwin, of the police force of Kansas City, arrested him and told him he would have to go with them to the police station. The defendant requested them to allow him to get his coat which was in the tent. The sergeant directed Jadwin and Wakefield, another policeman, who came up about the time of the arrest, to go into the tent with defendant. They went in and defendant took his coat out of a box and then asked permission to undress his little boy who was lying asleep under a cot in the tent and the officers assented. Defendant then pulled off the boy's shoes and stockings. The defendant then got under the cot and the witness Wakefield thought he was pulling off the boy's waist, and said to defendant, "Hurry up, we can't stay here so long," and just as he said that defendant came out and said, "I have done my do, now you can have me," and then attempted to cut his own throat. Jadwin remarked, "He has cut his boy's throat," and just at that moment he make the stroke at his own throat, when Jadwin struck him and stunned him and Wakefield knocked the knife out of his hand. They then took him to the station and sent the boy to the hospital where he died in a few minutes. The boy's throat was cut. The knife had severed the jugular vein and cut through the windpipe and through all of the blood vessels inside of the neck. The physician, Dr. McDonald, testified that it was all done with one stroke.

Officer Wakefield testified defendant did not seem

excited until after he committed the deed, then he was excited.

Officer Jadwin testified that he was stationed near this horse-show tent. Just a short time prior to the killing of his son by defendant, Sergeant Martin came along and said to witness, "Are you busy?" and he answered, "Not especially," and he said, "Come and go with me." We went a short distance and we came to two ladies and a little girl, and the sergeant spoke to them, and said, "Go ahead," and when they came to where defendant Speyer was, they said, "There he is." The officers went up to him and told him they wanted him, and he said, "Very well." Then Jadwin touched defendant on the arm and said, "Come on," and he said, "I want to get my coat." They then went into the tent and defendant called to the little boy and said, "Freddie! Freddie!" and said, "I guess he is asleep." He said, "I want to undress him." It was then about nine o'clock at night. Jadwin said, "Isn't there anybody to attend to your little boy but yourself when you are gone," and he said, "I am all." Jadwin then said, "Very well then, you can undress him." He took off his shoes and stockings and opened the waist. He sat there a little while, then he stooped when he got up to his neck, and then straightened up and did something with his right hand I thought was unusual. Then he stooped down further again and commenced to work again at this collar and about that time said, "My wife has forsaken me, I am alone, this is my job;" then he slipped his hand down on his little boy's throat like this, he was over him and, just as he did that, he motioned with his hand and swung out and said, "Now you can have me, I have done my work," and then attempted to cut his own throat, whereupon the officer struck him and he stumbled, and Jadwin said to Wakefield, "He has killed his little boy, and is trying to kill himself." They grabbed him and

forced him to the entrance, and the sergeant and Wakefield took charge of him while Jadwin went to the little boy and secured the knife, which was exhibited to him on the trial, identified and admitted in evidence. The defendant seemed rather deliberate, cool and solemn. Just before the sergeant arrested defendant, a crowd began to collect around the door of the tent, and Mrs. Reed said to defendant, "Don't you open your mouth." She was excited and spoke in a commanding way. She said, "You keep your mouth shut, I don't want you to say a word, we know all about it." Another lady who came with Mrs. Reed commenced to cry and said to defendant, "you have ruined my little girl." They both spoke in a loud excited tone; there were probably from twenty-five to fifty people crowding around. This officer stated that defendant's actions were suspicious. He says, "I observed something strange and peculiar in his actions. When he stooped to unlock the box to get his coat, it occurred to me his mind wasn't on what he was doing. Everything he did seemed peculiar. I thought he was going to run." On cross-examination this officer said he would not be positive as to what defendant said, but he thought he said, "My wife has forsaken me. I am alone, this is a job." He may have said, "My wife is away from me." He stated further that prior to the arrest the sergeant asked defendant if he knew Mrs. Tennis's little girl, pointing to her, and he said he had seen her playing around there that evening.

The officer testified to a statement made to him by defendant while in his charge, in which defendant said he couldn't bear to leave this little boy. "I didn't think about killing him until I got in the tent. If he had waked up, I don't believe I would have done it. I couldn't bear to leave him." "I thought they were going to hang or mob me and I wanted to talk with him." "If my throat hadn't been so tough, I would have killed myself." A statement made by defendant

while under arrest in the prosecuting attorney's office was read in evidence, over the exception of his counsel that the same was not voluntary.

Sergeant Martin corroborated the other officers about the details of the arrest of defendant at the request of Mrs. Tennis. He adds that he asked defendant if he had seen the little girl of Mrs. Tennis and he said he had. "I asked him if he had given her a dime and he said he had. I asked him what for and he said to get her some ice cream. I told him that she went home and told pretty bad tales about what occurred that afternoon between him and her and her mother wanted him arrested. He said he had not wronged the little girl. Mrs. Reed said he ought to be killed and went on crying. She threatened him." He says the crowd continued to gather around while Mrs. Reed and Mrs. Tennis were talking and crying.

Henry Stone, a reporter for the Journal, testified he was at the station when defendant was brought down that night and heard him say that he had killed his boy because a serious charge had been placed against him and that he had lived in the South and knew what the probable effect would be; that he would be disgraced certainly, and probably lynched; that he had been accused of an assault or attempt to assault this little girl, and he couldn't bear to leave his boy alone because he dreaded the disgrace for him. He was afraid he might be mistreated if he wasn't there to care for him—that he had never mistreated the little girl. When he was arrested, it was then that this feeling came over him, he couldn't leave his child alone; that he would be taken away from him; that he would rather kill him and himself; he did kill the child and attempted to kill himself, but the knife was not sharp enough. This witness saw the handkerchief removed from defendant's neck at the station so that they could see the wound he inflicted on himself. He saw the wound gaping open. It extended around under the neck.

The statement of defendant is as follows:

"My name is John Martin Speyer. I am thirty-two years old. I killed my son Fred M. Speyer on July 16, 1902, by cutting his throat with my knife. He was asleep when I cut his throat. I tried to wake him but could not. I killed him because I was somewhat despondent, and thought that I was about to be arrested and taken away from him, that he would not get fair treatment. I intended to kill myself immediately after killing him but the knife was too dull.

"During my life I have enjoyed good health; have never used whiskey, morphine, cocaine or any other kind of dope, and was perfectly sober when I killed my boy.

"I have always been in my right senses, never had fits, or epilepsy, and so far as I know, there never. was any insanity in my family. I never suffered from sunstroke or any other disease or accident which would tend to impair my mental faculties. I loved my boy better than my own life and I felt that, as this woman had made such a public charge against me, I would be disgraced and perhaps mobbed. The charge was utterly false, but I did not know what kind of a country I was in, and people in some countries listen more to a woman than to a.man when such charges are against him, and so I could see nothing but disgrace ahead and I was afraid my boy would suffer, so all at once the thought struck me to kill him, so I fumbled around to keep the officer from seeing what I was doing, jerked out my knife and killed him, then slashed at my own throat, but the knife was too dull and about that time the officer struck me with his club.

"The above is a true statement and I make it voluntarily and of my own free will to assistant prosecuting attorney Frank Blake and in the presence of police officers J. A. Jadwin and J. F. Wakefield. No promises have been held out to me and no threats made to me.　　　　　　　　　J. M. SPEYER.

"July 24th, 1902."

The foregoing was the evidence for the State.

For the defendant, his wife, Mrs. Speyer, testified they were married in 1893 and their home was in New Orleans. Had two children, little girl of eight, and the little boy, Freddie, who was five years and ten months old when he was killed. Her husband, defendant, was in the show business when they were married.

She travelled with him a portion of the time. He was a good husband, and a good kind, loving father; no man could treat his wife and children better than he did me and my two children. She testified that defendant worked continuously for about nine months on a patent, a composition of coffee and milk, and was wrought up over it; all unstrung when he found it was already patented by another. Then he worked three or four years on a machine to make a bridle without a head stall. He got so interested in it that he paid no attention to his family. She noticed it was a strain on him and tried to get him to quit it. This went on until on one occasion he was sitting on the edge of the bed playing with the child and then all of a sudden he grabbed the little boy and tried to jump out of the window with him. His eyes were popping out of his head. She screamed and grabbed hold of the child and shook him. She was advised to leave him then and did so. She stayed home about two weeks. After that he never looked the same. Looked wild in his eyes. In 1898 he imagined the Indians were after him and got up in the night, saddled the horse and rode twenty miles and came back next morning all wet and said the Indians were after him.

There was evidence that a crowd gathered in front of the tent at which defendant was talking after the ladies were seen there, and when he was arrested they tried to follow him in, but the officers would not permit them to do so. One man was heard to say if he had a rope he would hang him. Defendant testified in his

own behalf. He was born in Michigan and lived there until twelve years old. He had worked on various patents. Had about perfected one when his partner secured the patent without his knowledge. He then worked for nearly a year trying to perfect a patent on condensed coffee. He worked three or four years on a patent bridle, a bridle without a headstall, and went to work on the machinery to manufacture it. In 1896 while riding a horse at White Rock, Texas, the horse became unruly, and in attempting to dismount his foot caught in the stirrup and he fell and the horse's fore feet struck him on the head and jaw, which caused him to spit blood for several weeks thereafter, and bleeding at the nose. Since then he has had delusions that Indians were after him. After corroborating the story of the officers as to the circumstances attending his arrest, he testified that as he went into the tent with the officers, he heard some one say, "They will lynch him."

As he was undressing his little boy he became dazed. He imagined there was a rope around his neck and thought they were stretching him up and thought he could hear the crowd abusing the little boy and under the strain he took his knife and cut his throat and tried to cut his own. He couldn't resist it. Everything about the homicide was unreal to him. He didn't know what was going on. Ever since the accident at White Rock he had had a numbness in one side of his head, as if paralyzed. He said he knew the accusations of Mrs. Reed and Mrs. Tennis were untrue. He had never wronged the little girl in any way. After the lady made the charge against him he was afraid of the crowd. He thought they believed the charge. He had no recollection as to whether the knife was open or not when he determined to kill his boy. The whole thing seemed like an age to him, though he must have acted instantly. He didn't remember telling the attorney that if they were going to hang him him they might as well do it

then. His recollection was very dim as to the tragedy and what occurred that night.

Several physicians who had made a special study of mental and nervous diseases testified in answer to a hypothetical question embodying the evidence as to defendant's life, injuries to his head and the symptoms subsequently developed and including the charge of assault and the killing of his little son, and they answered that in their opinion the defendant at the time was insane; that the facts assumed portrayed a vivid picture of an insane man. They attributed his insanity to the blow on his head when his horse struck him in 1896. Such a blow would likely result in injury to the brain which would be developed years afterwards. Assuming that defendant had paralysis of one side of the face and still suffers from it, it indicates an injury to the brain. The destruction of his own innocent and unoffending offspring because he was charged with an offense was a wholly irrational act.

On the other hand experts testified on behalf of the State that defendant was sane at the time he killed his child, basing their opinions upon hypothetical questions founded on the evidence.

At the close of the evidence the court instructed the jury on murder in the first and second degree, the defense of insanity, credibility of witnesses, reasonable doubt, and what effect should be given to the evidence of a motive or want of motive for commission of the offense.

The jury found defendant guilty of murder in the second degree and assessed his punishment at twenty years in the State penitentiary. After an unsuccessful motion for a new trial, the court sentenced the defendant in accordance with the verdict, and defendant appealed to this court.

I. The information in this case was not verified as required by the statute, but no advantage of this failure

to comply with the statute was taken by a motion to quash the information and hence the failure to verify is not open to review in this court.

II.   The most serious ground for a reversal of this judgment and sentence is the action of the criminal court in giving instruction 3 of its own motion. That instruction is in these words.

"3.   The court instructs the jury that if they fail to find a verdict according to the law as declared in instruction numbered 2, but shall find and believe from the evidence that at the county of Jackson and State of Missouri, at any time before the fifteenth day of September, 1902, the defendant willfully, feloniously, premeditatedly and with malice aforethought intentionally cut the throat of Freddie Speyer with a pocket knife, and that such pocket knife as used by him was a dangerous and deadly weapon, and from which said wound the said Freddie Speyer, at the county of Jackson and State of Missouri, immediately died, and that immediately before such act the defendant had been placed under arrest. charged with a crime, and that threats of lynching had been made in his presence, and demonstrations which led him to believe that he was in imminent peril of being immediately hanged, and such belief, coupled with the fear of leaving his son alone in the world, suddenly arrested his powers of reflection to such an extent that at the time and immediately before he struck the homicidal blow he was incapable of deliberation, and in fact did not deliberate, as that term is defined in the other instruction, then you will find him guilty of murder in the second degree and assess his punishment at imprisonment in the State penitentiary for any term not less than ten years, unless you find from the evidence that the defendant was insane when he committed the deed, as defined in the instruction on that subject."

This record presents a case exceptional in all its

State v. Speyer.

features. A father is charged with the murder of his innocent, unoffending and sleeping child. That he cut the little boy's throat with a knife is conceded. The evidence discloses that up to the fatal moment when he plunged the knife into the little one's throat he had cherished the warmest affection for his child and had scrupulously cared for all his wants. There is not the slightest evidence of any criminal pupose in taking the child's life beyond that which the law will presume from the act itself. The very enormity of the act suggests a doubt of the sanity of the defendant. The child himself did not and could not have been guilty of anything which the law would regard as a provocation either just or unlawful. The evidence tends to show that the warmest affection existed between the father and the little one. We are compelled to look for an explanation of this most unnatural deed in the circumstances detailed by the witnesses. The killing of the child is traceable to the circumstances surrounding the defendant at the time and just prior to the fatal act.

The defendant was a skilled horseman and was giving exhibitions of his horsemanship for the Karnival Krew Company of Kansas City, by whom he was employed, and the little boy had also become proficient in riding and accompanied his father, the mother and little sister remaining at home in New Orleans. Only a few minutes before the homicide occurred, two ladies with a little girl had appeared in front of the tent in which defendant was to give an exhibition that night, and an officer pointing to the little girl, inquired of him if he knew her or had seen her, and defendant said that he had seen her around the tent, and had given her a dime to get her some ice-cream, whereupon one of the ladies began to upbraid him, and the other, the mother of the little girl, charged him with the ruin of her daughter and began to cry. A crowd commenced to collect and the officer told defendant he must take him to the station, to which defendant assented, but asked the

privilege of getting his coat which was in the tent. As he went into the tent in charge of two policemen, there were threats of lynching or mobbing him heard by him. He went in, got his coat and seeing his little boy asleep asked to be allowed to undress him, and when the officers learned that he had no one else to look after the child they consented. He began to undress the child and had removed his shoes and stockings; suddenly and before the officers could prevent it, he drew a knife and cut the child's throat and then cut his own throat. The stroke killed the child but failed to kill the defendant. The explanation and the only explanation for this deed was that given by the defendant, namely, that knowing of the charge just made against him and believing he would be mobbed, and seeing the child before him and feeling that the little one would be left alone and disgraced and perhaps mistreated on his, defendant's account, he madly determined to kill him rather than leave him to such a fate, and instantly executed the thought which he says oppressed and overcame him at that moment and that he was powerless to resist it.

His defense was insanity and there was evidence that he had received a severe stroke on his face and head from his horse in 1896, which had given him great pain, and that the side of his face was paralyzed or numb from the effects of the blow; that afterwards he attempted to jump out of a window with this same child, and had been restrained by his wife; that he had shown other marked evidences of aberration at different times. Medical experts attributed his unnatural homicidal act to delusional insanity caused by the blow on his head.

When we come to measure the conduct of defendant as a criminal act, we find all of the ordinary concomitants absent. We must discard at once all idea of malice in the popular sense of ill will, hatred, or revenge, because the evidence demonstrates that up to the very moment of the unnatural deed he had displayed nothing but the natural affection of a father for a dutiful child.

State v. Speyer.

Likewise all semblance of provocation moving from the child is negatived. On the other hand we find nothing in the facts which would permit us to ascribe the homicide to accident or misadventure because all the testimony shows the deed was intentional. Those motives which ordinarily impel men to commit a crime of this character are not to be found in the case. We are, therefore, to test the defendant's homicidal act by old and settled principles of law, and apply them as best we can to these new and startling conditions.

While it is a settled principle of criminal law that without a criminal intent there can be no felony, it is equally well settled that a man is presumed to intend the natural, necessary and probable consequences of what he intentionally does. The act of the defendant, then, in intentionally killing his child with a deadly weapon is presumptively murder, unless at the time he committed the act his reason and mental powers were so deficient that he had no conception of the right or wrong of the act he was about to commit. With these elementary principles to guide us, was the third instruction above set forth a correct guide to the jury or was it erroneous?

It will be noted that our learned brother of the criminal court drew a marked distinction between the mental power and capacity to deliberate, and the capacity to premeditate. The instruction in effect tells the jury that, although the circumstances surrounding the defendant were such that, coupled with his fear of being lynched on the one hand and the alternative of leaving his child alone and unprotected in the world on the other, as to arrest his powers of reasoning and reflecting to such an extent that he was incapable of deliberation and in fact did not deliberate, still, he could premeditate his act and if he did he was guilty of murder in the second degree. That is to say, he might be so insane that he could not deliberate and hence could not be guilty of murder in the first degree and yet sane

enough to premeditate and therefore guilty of murder in the second degree. It will be observed that the court concedes that the conditions may have been such as to suddenly arrest the defendant's powers of reflection to such an extent that he was incapable of deliberation.

By reflection as here used we understand that operation of power of the mind of judging rationally, especially in view of a moral rule or standard; a power to understand the right from the wrong of an act about to be performed.

In State v. Kotovsky, 11 Mo. App. 584, the St. Louis Court of Appeals held that there are in criminal cases no degrees of mental accountability, and this court in the same case, 74 Mo. l. c. 249, said: "If the defendant was so insane that he had not the mental capacity to deliberate, neither could he premeditate. They are of the same character of mental operations, differing only in degree. Deliberation is only prolonged premeditation." We think the distinction made in the instruction between the mental capacity to deliberate and premeditate can not be maintained. The mental capacity to premeditate is as great as the power to deliberate, and the accountability and responsibility for crime is as great in the one as in the other. If incapable of deliberation he was also incapable of premeditation. If incapable of either he was not guilty of murder in either degree. Such a distinction can not be safely made in holding one accountable for crime. In our opinion the instruction was erroneous, and the defendant was improperly convicted of murder in the second degree. The fact that defendant requested the court to give an instruction on murder in the second degree did not cure this incorrect instruction. The medical experts recognized as do the writers on insanity that "excessive pain or sorrow, pleasure or joy can entirely prevent thought from taking place," and that such "conditions exist in the insane; the self-consciousness being so changed or affected that the usual response to impressions no longer

take place, leading thus in an abnormal way to abnormal feeling, thought, and volition.'' [3 Witthaus & Becker, Med. Juris., p. 181.]

Our conclusion is that if the facts upon which the third instruction given by the court is predicated were found by the jury to exist at the time defendant killed his child he was not legally responsible for his act and he could not be convicted of murder in either degree.

The court's other instructions on insanity were correct and full, and such as have been approved by this court in many cases.

For the error in giving instruction No. 3 by the court of its own motion, the judgment must be and is reversed and the cause remanded.

All concur.