## THE STATE v. JOHN M. SPEYER, Appellant.

**Division Two, December 10, 1907.**

1. **EVIDENCE: Other Crimes.** Testimony of a witness as to what occurred between her and defendant prior to the time he killed his little son, indicating or insinuating that defendant had committed some unlawful act upon her, should be excluded; and if it is incompetent for her to testify as to such things, it is also incompetent for a police officer who arrested defendant or any other witness to testify to them.

2. ———: ———: **Waiver.** But where defendant has made a voluntary written statement in which he refers to that wrongful act, and that statement is read by the State without objection, the judgment should not be reversed for the wrongful lugging in of the policeman's testimony concerning the wrongful act of defendant towards the woman prior to the homicide of his little boy.

3. ———: **Expert's Opinion: Insanity: Objection as to Form, Etc.** The physician on cross-examination was asked this question: "If that man killed the boy because he feared that he was to be put in jail on a serious charge, and the boy would be neglect-

ed and abused, and he killed him for that reason, would you regard that as an evidence that he did not know that it was wrong to kill him?" *Held*, that it was not error to overrule objections to the question that it was not in proper form and that it was "not an examination of anything drawn out in chief."

4. ———: ———: **No Objection at Trial.** An objection to certain questions propounded to the expert cannot be made for the first time in the motion for a new trial or in the appellate court.

5. ———: **Letters to His Wife: Evidence of Abandonment.** Where there was no evidence that could be called such that defendant had abandoned his wife, it was not error to exclude letters from him to her which intended to show that he had not abandoned her.

6. ———: **Rebuttal: Insanity: Former Testimony.** Where the defense is insanity it is proper to permit the State, in rebuttal, to introduce in evidence the testimony of defendant on his former trials for the same offense.

7. ———: ———: ———: ———: **No Objection.** Where no objection was made at the time as to the mode of proving defendant's testimony on the former trial, an objection made for the first time in the motion for new trial or on appeal that it was not shown that the testimony offered as that of defendant on the former trial was in fact his testimony, cannot be considered.

8. ———: **Preserved by Bill of Exceptions.** Section 3149, Revised Statutes 1899, providing that when evidence has been preserved by bill of exceptions in any case the same may thereafter be used in the same manner as if such testimony had been preserved in a deposition, has no application to a defendant in a criminal case, for the deposition of a defendant in a felony case is never taken.

9. **MURDER IN FIRST DEGREE: Deliberation.** Both deliberation and premeditation are necessary constituents of murder in the first degree, and if either is absent no instruction for murder in that degree can be given. Deliberation is only prolonged premeditation. It means not only to think of beforehand (which may be but for an instant), but the inclination to do the act must be considered, weighed, pondered upon for such a length of time after the provocation is given as the jury may find was sufficient for the blood to cool. One "in a heat of passion" may premeditate without deliberating; while deliberation is only exercised in a cool state of the blood. Therefore, where the evidence shows that when defendant entered the tent and found his little boy asleep he had no thought of killing him, but that, all at once, realizing that he was a

stranger in the city, and was about to be led away to jail charged with a heinous crime, and realizing his wife was far away and that the little fellow left alone would likely be mistreated, the thought struck him to kill the child and he jerked out his knife and did so, there was no deliberation, and an instruction for murder in the first degree should not have been given.

10. ———: ———: **Instruction.** An instruction for murder in the first degree which omits the elements of premeditation and deliberation, as an instruction given in this case does, is erroneous.

11. ———: **Insanity: Admission of Charge.** In no event does the defense of insanity admit the grade of the offense charged in the indictment or information. It admits nothing more than that defendant committed the act with which he is charged, but it does not admit that it was a crime.

12. **INTENTIONAL HOMICIDE.** The intentional killing by defendant of his little boy, as the facts of this case show it to be, was either murder in the second degree, or manslaughter in the fourth degree under the statute which declares that an intentional killing without malice aforethought is manslaughter in that degree—or it was no crime at all, because of defendant's insanity.

13. ———: **Insanity.** The evidence in this case is again *held* to establish that the act of defendant, in killing his little boy, under the circumstances, was that of an insane man, and surprise is expressed that he was convicted of any crime, and for that reason the verdict is not permitted to stand, but the case is remanded for a new trial.

Appeal from Jackson Criminal Court.—*Hon. John A. Rich*, Special Judge.

REVERSED AND REMANDED.

*W. F. Riggs* for appellant.

*Herbert S. Hadley*, Attorney-General, and *John Kennish*, Assistant Attorney-General, for the State.

(1) The court did not err in admitting in evidence on rebuttal the testimony of defendant given on the two former trials. Kelley's Crim. Law and Prac., sec.

285; Underhill on Crim. Evid., sec. 131.   (2) Appellant complains that the evidence did not justify the court in giving an instruction for murder in the first degree. The court did not err in giving such instruction.   There was evidence tending to prove that defendant killed his boy to keep his wife from getting possession of him, and the child could not have given any provocation that would have reduced the grade of the crime. State v. Speyer, 182 Mo. 89.   Besides, it has been declared the law in this State that the ''plea of insanity, tendered by defendant, both by testimony and instructions, was in itself an admission that the act charged against him in the indictment was truly charged.'' State v. Stubblefield, 157 Mo. 364; State v. Pagels, 92 Mo. 300; State v. Welsor, 117 Mo. 570; State v. Soper, 148 Mo. 217.

BURGESS, J.—This is the third appeal by defendant in this cause.   On the first trial defendant was convicted of murder in the second degree, and, upon appeal, the judgment was reversed and the cause remanded.   [State v. Speyer, 182 Mo. 77.]   On the second trial defendant was convicted of murder in the first degree, and, upon appeal, the judgment was reversed and the cause remanded.   [State v. Speyer, 194 Mo. 459.]   Upon the third trial the defendant was again convicted of murder in the first degree, from which judgment, after unsuccessful motions for new trial and in arrest of judgment, he appeals.

The facts are fully and fairly stated by GANTT, P. J., in 182 Mo. 77.   If, however, it be thought necessary, other facts developed at this trial will be stated in the course of the opinion.

On the second trial of this cause one Margaret Tennis, a young girl upon whom defendant was charged with having made an assault, and for which he was under arrest at the time of the homicide, was per-

mitted to testify over the objection of the defendant, and in passing upon the admissibility of her testimony this court said: "We will say that any testimony by this witness as to what occurred between her and the defendant prior to the killing of Freddie Speyer has absolutely nothing to do with this case. The effect of such testimony can only have the tendency to unjustly prejudice the minds of the jury against the defendant upon an issue not involved in the trial of this case, and upon its retrial all references of this witness having met the defendant prior to the time of the killing, and the length of time that she was with him, should be promptly excluded. While this witness, Marguerite Tennis, in her examination in chief, cross-examination and redirect examination, says but little which has any bearing upon the issues involved in this case, yet there is in her testimony some insinuations or statements from which the jury might draw inferences that the defendant had committed some unlawful act in respect to this witness, and it is not uncommon that a mere insinuation of the commission of a wrong is about as injurious as a positive and broad statement that the wrong was committed; therefore, it is highly important that no such testimony be permitted to go to the jury." [194 Mo. l. c. 471.] This witness did not testify upon the last trial; but it is contended by defendant that this direction of the court was violated in numerous instances by the prosecuting attorney, and that the court erred in permitting John Martin, the police officer in whose custody defendant was at the time of the killing, to testify, over defendant's objections, that upon the evening he placed defendant under arrest upon the charge of assaulting the girl, "there was a couple of ladies come up to me." . . . "So, then I asked this little girl;" . . . "I asked this party [meaning the girl], if this was the man, and she said, 'Yes.'" The defendant insists that, under the rule an-

nounced, the girl would not have been permitted to testify with reference to anything which might have occurred between her and defendant prior to the homicide, and that these remarks of the officer have reference to the same occurrence, and come under the ruling of this court on the last appeal. We are inclined to take the same view of the matter; but as the defendant himself, on July 24, 1902, in a voluntary written statement with reference to the homicide and the attending facts and circumstances, which statement was read in evidence by the State without objection, alluded to the same charge "as this woman had made against him," we do not think the judgment should be reversed on that ground. But we do not intend to be understood as holding that the facts and circumstances connected with said assault should be admitted in evidence upon another trial, should such be had.

It is also claimed by defendant that the court erred in permitting the State to ask Dr. Glasscock, an expert witness, the following question: "Doctor, if that man killed the boy because he feared that he was to be put in jail on a serious charge, and the boy would be neglected and abused, and he killed him for that reason, would you regard that as an evidence that he did not know that it was wrong to kill him?" The only objections interposed by defendant to this question were that it was not in proper form, and that it was "not an examination of anything drawn out in chief." It is clear that there was no error in overruling these objections, as they do not, under our rulings, really amount to such. Complaint is also made of the court's action in permitting the State to ask these further questions of the same witness: "You do not know whether there was any trouble between him and his wife over the boy?" and, "Would the fact that he told the police officer that he and his wife had trouble?" etc.

An examination of the record fails to show that defendant made any objection whatever to these questions, and an objection cannot be raised for the first time in the motion for a new trial or on appeal.

In the fourth and fifth assignments of error defendant complains of the action of the court in sustaining an objection made by the State to the introduction in evidence by the defendant of certain letters which purported to have been written by defendant to his wife before the commission of the homicide. These are the same letters whose admissibility was fully discussed by Judge Fox on the last appeal. The court held upon that appeal that the letters were properly excluded as being incompetent for the purpose of proving the affection of defendant for his child. The defendant now contends that although not admissible for that purpose, yet, as the State upon the last trial introduced some evidence tending to show that defendant had abandoned his wife, they were admissible for the purpose of showing that he had not done so. There was really no evidence that could be called such that defendant had abandoned his wife, such supposition having no further support than the testimony of the policeman, Martin, who testified that, in a conversation had with defendant in the jail where he was confined, the defendant told him that "at the time he killed his son he was all in the world he had. He said when he went in there his intention wasn't to do anything, but there was a cloud came over him, and he was afraid he was going to be mobbed, and that his son was the only thing on earth for his wife to get, and he said he didn't want to leave the boy." Being asked to tell the jury all that was said about the wife as near as he could recall it, witness said, "He simply made the remark that that was all on the earth he had, and his intention was to kill the boy and himself; in words, that is the way he put it." Being again asked to tell

all that defendant said about his wife and the boy,
witness replied, "Well, he said he had a great deal of
trouble in life, and he was just getting on his feet, and
this coming up he didn't know what was going to be
the outcome." To say that by defendant's statement to
the policeman that "his son was the only thing on
earth for his wife to get" he meant that he did not
want his wife to have the boy for the reason that he
had separated from her is a bare and unwarranted
assumption; and how the further remark of the de-
fendant, that he "had a great deal of trouble in life,"
could be tortured into meaning that he had trouble with
his wife and had separated from her, is beyond com-
prehension.    It is clear, we think, from the evidence
that the defendant's greatest concern at the time he
was placed under arrest upon the charge made by the
girl was the welfare of his little son, whom he did not
want to leave, in a large city, among strangers who
might mistreat him, the child's mother being many
hundreds of miles away, and rather than be separated
from him, under the circumstances as they appeared
to his bewildered brain, he preferred taking his life
as also his own; that he did not succeed in accomplish-
ing his purpose to take his own life was only due to
the quick action of the police officer who struck him
with his club and took his knife away.    There being
no evidence that the defendant and his wife had had
trouble, and had separated, his motive in killing the
boy could not have been revenge upon the mother, but
rather apprehension of ill-treatment of the boy by
others.    Besides, the case was submitted to the jury
upon this latter theory.    There was, therefore, no error
in sustaining the objection to the letters being read in
evidence.

It is also asserted that error was committed in
admitting in evidence, on rebuttal, the testimony of de-
fendant given upon the two former trials.    This evi-

dence it seems was introduced by the State to negative the defense of insanity. The objection interposed by defendant to its introduction was that it was "incompetent, immaterial and irrelevant, for the reason that it is not rebuttal." The law presumes that every man is sane, and defendant having interposed his insanity as a defense, the burden rested upon him to show by the weight of the evidence that he was insane at the time of the homicide, and the defendant having introduced evidence to establish that defense, it was entirely proper for the State, in rebuttal, to introduce in evidence the testimony of the defendant on the former trials. [Underhill on Crim. Evidence, sec. 285.] In Com. v. Reynolds, 122 Mass. 454, it is held that statements made by a defendant while testifying at a former trial are competent either as admissions or for the purpose of contradicting him. They were voluntary statements explanatory of his connection with the transaction, and it was immaterial when or where they were made. To the same effect is State v. Oliver, 55 Kan. 711. There was no objection made at the time as to the mode of proving the defendant's former testimony, nor was objection made to the reading of the testimony beyond the part identified by the stenographer, and it cannot be made for the first time in the motion for a new trial or upon appeal. As supporting his contention in this respect defendant relies on section 3149, Revised Statutes 1899, which provides that when evidence has been preserved by bill of exceptions in any case, the same may thereafter be used in the same manner as if such testimony had been preserved in a deposition. But that statute has no application to a *defendant* in any case, criminal or civil. The deposition of a defendant in a felony case is never taken, because the law requires his presence during the entire trial. Even if the deposition of a party to a civil action be taken and filed in the case, and he be present at the

trial, any statements made by him affecting the merits may be shown against him by the adverse party, notwithstanding his presence. [Bank v. Nichols, 202 Mo. 309.] So, with respect to the defendant in a criminal case, any statements made by him as to the facts of of the case are admissible against him.

Defendant insists that the evidence did not justify the giving by the court of an instruction for murder in the first degree. As we have said, there was no evidence tending to prove that defendant killed his son to prevent his wife from getting possession of him, and the evidence relied upon by the State as tending to establish such fact falls far short of it. When the case was before us upon the first appeal, 182 Mo. 77, GANTT, P. J., speaking for the court, said:

"This record presents a case exceptional in all its features. A father is charged with the murder of his innocent, unoffending and sleeping child. That he cut the little boy's throat with a knife is conceded. The evidence discloses that up to the fatal moment when he plunged the knife into the little one's throat he had cherished the warmest affection for his child and had scrupulously cared for all his wants. There is not the slightest evidence of any criminal purpose in taking the child's life beyond that which the law will presume from the act itself. The very enormity of the act suggests a doubt of the sanity of the defendant. The child himself did not and could not have been guilty of anything which the law would regard as a provocation either just or unlawful. The evidence tends to show that the warmest affection existed between the father and the little one. We are compelled to look for an explanation of this most unnatural deed in the circumstances detailed by the witnesses. The killing of the child is traceable to the circumstances surrounding the defendant at the time and just prior to the fatal act.

"The defendant was a skilled horseman and was giving exhibitions of his horsemanship for the Karnival Krew Company of Kansas City, by whom he was employed, and the little boy had become proficient in riding and accompanied his father, the mother and little sister remaining at home in New Orleans. Only a few minutes before the homicide occurred, two ladies with a little girl had appeared in front of the tent in which defendant was to give an exhibition that night, and an officer, pointing to the little girl, inquired of him if he knew her or had seen her, and defendant said that he had seen her around the tent, and had given her a dime to get her some ice cream, whereupon one of the ladies began to upbraid him, and the other, the mother of the little girl, charged him with the ruin of her daughter and began to cry. A crowd commenced to collect and the officer told defendant he must take him to the station, to which defendant assented, but asked the privilege of getting his coat which was in the tent. As he went into the tent in charge of two policemen, there were threats of lynching or mobbing him heard by him. He went in, got his coat, and seeing his little boy asleep asked to be allowed to undress him, and when the officers learned that he had no one else to look after the child they consented. He began to undress the child, and had removed his shoes and stockings; suddenly and before the officers could prevent it, he drew a knife and cut the child's throat and then cut his own throat. The stroke killed the child but failed to kill the defendant. The explanation and the only explanation for this deed was that given by the defendant, namely, that knowing of the charge just made against him and believing he would be mobbed, and seeing the child before him and feeling that the little one would be left alone and disgraced and perhaps mistreated on his, defendant's, account, he madly determined to kill him rather than leave him

to such a fate, and instantly executed the thought which he says oppressed and overcame him at that moment and that he was powerless to resist it."

Later on, in the course of the same opinion, it is said:

"When we come to measure the conduct of defendant as a criminal act, we find all of the ordinary concomitants absent. We must discard at once all idea of malice in the popular sense of ill-will, hatred, or revenge, because the evidence demonstrates that up to the very moment of the unnatural deed he had displayed nothing but the natural affection of a father for a dutiful child. Likewise all semblance of provocation moving from the child is negatived. On the other hand, we find nothing in the facts which would permit us to ascribe the homicide to accident or misadventure, because all the testimony shows the deed was intentional. Those motives which ordinarily impel men to commit a crime of this character are not to be found in the case. We are, therefore, to test the defendant's homicidal act by old and settled principles of law, and apply them as best we can to these new and startling conditions.

"While it is a settled principle of criminal law that without a criminal intent there can be no felony, it is equally well settled that a man is presumed to intend the natural, necessary and probable consequences of what he intentionally does. The act of the defendant, then, in intentionally killing his child with a deadly weapon is presumptively murder, unless at the time he committed the act his reason and mental powers were so deficient that he had no conception of the right or wrong of the act he was about to commit."

Both deliberation and premeditation are necessary constituents of murder in the first degree, and while it devolves upon the State to prove both, they may be

shown by either facts or circumstances. The purpose
to kill may be formed the moment before it is executed
as well as for an hour or a day, and still the act be
premeditated. [State v. Dunn, 18 Mo. 419; State v.
Jennings, 18 Mo. 435; State v. Starr, 38 Mo. 270; State
v. Holme, 54 Mo. 153.] In the absence of either con-
stituent there can be no murder in the first degree.
The question, then, is, was there deliberation by de-
fendant before killing his son? We think not. In
State v. Kotovsky, 74 Mo. 1. c. 249, it is said: "De-
liberation is but prolonged premeditation. In other
words, in law, deliberation is premeditation, in a cool
state of the blood, or, where there has been heat of
passion, it is premeditation continued beyond the
period within which there has been time for the blood
to cool, in the given case. . . . Deliberation is also
premeditation, but is something more. It is not only
to think of beforehand, which may be but for an in-
stant, but the inclination to do the act is considered,
weighed, pondered upon, for such a length of time
after a provocation is given as the jury may find was
sufficient for the blood to cool. One in 'a heat of pas-
sion' may premeditate without deliberating. Delibera-
tion is only exercised in a 'cool state of the blood,'
while premeditation may be either in that state of
the blood or in 'heat of passion.' " [State v. Speyer,
182 Mo. 77.]

The evidence shows that at the time defendant
entered the tent, found his little boy asleep and at-
tempted to wake him, he had no thought of killing
him; but that, all at once, the thought struck him to
kill the child, and he jerked out his knife and did so.
If deliberation means prolonged premeditation, as be-
fore defined, it is clear that the killing was not de-
liberately done, and was not murder in the first degree.
In State v. Curtis, 70 Mo. 1. c. 599, it is said: "In
State v. Wieners, 66 Mo. 20, it was said: 'Premedita-

tion and deliberation are not synonyms, and a homicide may be premeditated without being deliberately committed.' It was further held in that case that 'murder in the second degree is such a homicide as would have been murder in the first degree if committed deliberately.' If these views be correct it must necessarily follow that all intentional homicides committed with premeditation and malice, but without deliberation, must be murder in the second degree. The word deliberation, as used in the statute, implies a cool state of the blood, and is intended to characterize what are ordinarily termed cold-blood murders; such as proceed from deep malignity of heart, or are prompted by motives of revenge or gain. These are classed as murders in the first degree. On the other hand, premeditation may exist in an excited state of mind, and if the passion or excitement of the mind be not provoked by what the law accepts as an adequate cause, so as to rebut the imputation of malice, an intentional killing under the influence of such a passion will be murder in the second degree." The same rule is announced in State v. Ellis, 74 Mo. 207. If, then, as ruled in these cases, only such murders are deliberate as proceed from deep malignity of heart, or are prompted by motives of revenge or gain, no instruction for murder in the first degree should have been given in this case, for it is perfectly clear from the facts in evidence that no malignity existed in the heart of the defendant toward the child at the time he killed him and that the deed was not prompted by motives of revenge.

This court has never held that an instruction for murder in the second degree should not be given in this case, but, on the first appeal, condemned an instruction upon that degree which had been given, for the reason that it drew a distinction between defendant's mental capacity to deliberate and his capacity to

premeditate, and, in effect, told the jury that defendant might be so insane that he could not be guilty of murder in the first degree, and yet sane enough to premeditate, and, therefore, might be guilty of murder in the second degree. The opinion, however, contained no intimation that a proper instruction for murder in the second degree should not be given.

But even if an instruction for murder in the first degree should have been given, the sixth instruction, upon that offense, is fatally defective. It tells the jury that "if they find and believe from the evidence that the defendant knew the right from the wrong of the particular act with which he stands charged, to-wit, the killing of Freddie Speyer, by cutting his throat with a pocket-knife, and if they further believe that he committed the act because he feared that he would be separated from his said child, Freddie Speyer, and that the child would fall into the hands of persons who would mistreat it, such reasons would not justify or excuse him in killing said child, and the jury will find the defendant guilty as charged in the information." This and the first instruction given for the State each attempted to cover the whole case. The first was correct, but this was not, since it did not require the jury to find that the killing was done with deliberation and premeditation, thus ignoring entirely two necessary ingredients of the offense. It makes no reference to the first instruction, thus leaving the jury to conjecture which should guide them in their deliberations; and it is probable that the verdict was made upon this very instruction rather than the one which the court gave defining murder in the first degree. That it is erroneous is apparent at a glance, and, standing alone as it does, independent of the first instruction, it is no surprise that the defendant was found guilty of murder in the first degree. A similar instruction was condemned in State v. Lentz, 184 Mo. 223. It is, however.

claimed by the State that, under the rulings of this court, the plea of insanity tendered by the defendant both by testimony and instructions was in itself an admission that the act charged against him in the information was truly charged.    In support of this contention are cited the cases of State v. Pagels, 92 Mo. 300; State v. Welsor, 117 Mo. 570; State v. Soper, 148 Mo. 217; State v. Stubblefield, 157 Mo. 360.    The three last-named cases simply follow the Pagels case, wherein it is said: "Indeed, the plea of insanity is of itself, and of necessity, a plea of confession and avoidance, the courts differing as to the *quantum* of evidence to sustain such plea. [1 Whart. Crim. Law (9 Ed.), sec. 61.]    Such plea is but a bare denial of a part of the government's case; it admits the *act* charged, but avers that there was no criminal intent accompanying the act, and, therefore, denies the *crime* charged. [2 Bish. Crim. Proc. (3 Ed.), sec. 669.]"

Under our code, a special plea of insanity is not required where insanity is relied upon as a defense, but may be shown on a plea of not guilty (People v. Olwell, 28 Cal. 456), or where the defendant declines to plead and the court orders the plea of not guilty to be entered for him.    He may make as many defenses as he has under such circumstances; but in no event does the defense of insanity admit the grade of offense as charged in the indictment or information; nothing more than that he committed the act with which he is charged, but not that it was a crime.    "Insanity is not an issue by itself, to be passed on separately from the other issues" (2 Bish. Crim. Proc. (3 Ed.), sec. 673), but, like any other issue, it is involved in the defense of not guilty, upon which the burden of proof is upon the State.    Of course, if insanity is the only defense, the homicide is confessed, "but the guilt, the crime of that homicide is denied, and this is all that is denied; for it stands to reason that on no other

ground could the plea of insanity have pretense of relevance in it." [State v. Soper, 148 Mo. 217.] This is as far as our decisions on this subject go, with the exception of State v. Stubblefield, supra, in which it was inadvertently said that "the plea of insanity tendered by defendant, both by testimony and instructions, was in itself an admission *that the act charged against him in the indictment was truly charged.*" But that expression is somewhat qualified by the words, "the very plea of insanity admits the doing of the act, but only denies its guilt because of such insanity." To the extent herein indicated we understand the decisions under consideration to go, and no further.

As the killing in this case was intentional, it is murder in the second degree, or manslaughter in the fourth degree, under section 1834, Revised Statutes 1899, which declares that an intentional killing, without malice aforethought, is manslaughter in that degree. [State v. Dierberger, 96 Mo. 666; State v. Edwards, 70 Mo. 480; State v. Curtis, 70 Mo. l. c. 600; State v. Watson, 95 Mo. 411.]

We cannot conclude this opinion without expressing our surprise at the conviction of defendant of any offense, under his defense of insanity and the evidence in support thereof, which shows, as we think, that he was insane at the time of the homicide. That his act in taking the life of his son, under the circumstances disclosed by the record, was that of an insane man hardly admits of a doubt. Yet, in the face of the facts as detailed, and the insane motives that prompted the deed, the defendant has by three different juries composed of the best citizens of the county in which the offense was committed and the cause tried, been found guilty of murder. With due deference to the men who composed these juries, and especially the last one, we must say that we are not satisfied with their verdict, and feel constrained to say that we do

not think it ought to be permitted to stand. In the former opinions of this court it is clearly intimated that the court was of the opinion that defendant was insane at the time of the homicide, but deferred to the finding of the juries upon that question.

For these considerations the judgment is reversed and remanded.

All concur.