Bernard **AUSTIN**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 19903.

United States Court of Appeals District of Columbia Circuit.

Argued June 14, 1966.

Decided June 16, 1967.

Messrs. Paul A. Lenzini and Thomas J. Schwab, Washington, D. C., (both appointed by this court) for appellant.

Mr. Charles A. Mays, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Donald S. Smith, Asst. U. S. Attys., were on the brief, for appellee.

Before DANAHER, Circuit Judge, BASTIAN, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

Appellant Bernard Austin was indicted for murdering Nettie Scott with premeditation, deliberation, and malice aforethought. There was no felony-murder count. Appellant was convicted of first-degree murder. The prosecutor did not request the death penalty. The jury recommended life imprisonment and appellant was sentenced accordingly. D.C.CODE §§ 22–2401 (1961), 22–2404 (Supp. V, 1966). On this appeal he challenges various portions of the trial court's charge to the jury and contends that the evidence at the close of the Government's case in chief was insufficient to withstand a motion for acquittal of first degree murder.

Our opinion is in three parts. First we review the Government's evidence and the rulings of the trial judge bearing on the issues of premeditation and deliberation. In Part II we consider how common law murder has been

divided by the legislature into different statutory categories, the first degree reserved for deliberated murders, such as those committed with coolness of mind, and second degree used for murders committed on impulse, in frenzy or the heat of passion. We conclude that the Government's case in chief, though ample to permit a finding of intentional murder, did not present evidence of premeditation and deliberation sufficient to warrant retention of the charge of murder in the first degree when gauged by proper tests. In Part III we conclude that the interest of justice will best be served by entry of an order, which we consider within the scope of our authority under 28 U.S.C. § 2106, remanding the case for entry of a judgment of conviction for murder in the second degree and for appropriate resentencing, but not for a new trial unless the District Court determines that a new trial is in the interest of justice.

I

The Government's evidence was as follows: Appellant was seen in the company of the deceased, Nettie Scott, for some period of time on the night in question. They were drinking together at an after-hours establishment called Will's Place, where appellant bought deceased a sandwich. During this period appellant was seen using a sharp pocket knife to repair the broken thumb nail of another female patron sitting at his table. At about 4:00 a. m. appellant left Will's place together with the deceased and her acquaintance, Mabel Proctor, and went to an all-night carry-out shop. The sandwiches bought there were eaten in appellant's truck. Appellant then drove Mabel Proctor home, dropping her off at about 4:30 a. m., and drove off in his truck with deceased. The Government produced no witness as to what happened thereafter. However, at approximately 5:00 a. m. that morning, two policemen,

cruising in an unmarked car, saw appellant's truck stopped in a parking bay off the Anacostia Parkway. As they approached to investigate they noticed some clothing lying on the grass near the truck. At that point appellant came up the bank from the river, got in his truck and drove away. Further investigation revealed bloody clothing and a pool of blood in the grassy area near the parking bay. The officers retrieved from the river the mutilated and nearly lifeless body of the deceased, nude except for a piece of clothing around her neck. She died almost immediately. Appellant was apprehended later that morning. Expert testimony revealed that deceased had suffered approximately 26 major stab wounds, culminating in a stab wound to the head, penetrating the brain, and lodging the broken blade in the skull. The body had suffered at least the same number of superficial lacerations. The expert concluded that the death had been caused by hemorrhage and shock from the multiple knife wounds.

The Government also produced evidence showing that the body of the deceased had been dragged from the grassy area where the bloody clothes were found to the sea wall, and that on the slope leading down to the river had been found a man's torn and bloody shirt, similar to one owned by appellant. There was no testimony as to any fights, quarrels, animosity, or threats between appellant and deceased.

Defense counsel moved for acquittal only of first degree murder at the close of the prosecution's case and again when defense rested. Although the District Court's denial of those motions was without opinion, its underlying views of the concepts of premeditation and deliberation are reflected in its rulings and actions on instructions. The court's charge on premeditation and deliberation [1] instructed the jury that premedita-

---

[1] "Now as to the fourth element of first degree murder, that the defendant acted with premeditation and with deliberation. Now premeditation is the formation of the intent or plan to kill; the formation of a positive design to kill. Deliberation means further, or to put it another way —I am speaking now of deliberation—

tion is the formation of an intention to kill, and deliberation means a further thought upon the plan to kill. The judge charged the jury that "although some time" is required for deliberation, deliberation may be sufficient "though it be of an exceedingly brief duration," and that the time "may be in the nature of hours, minutes or seconds."

Appellant requested that the time required for deliberation be stated as "some appreciable period of time," rather than "some period of time" as originally proposed by the judge. The court not only declined this request but changed the instruction submitted to counsel ("it does not require the lapse of days or hours or even minutes") to include the reference to "seconds."

Appellant has been represented by capable appointed counsel both in the District Court and on appeal. His counsel have focused essentially on two approaches: first, avoidance of a judgment of first degree murder by stressing both the evidence of intoxication and the lack of evidence of deliberation, and second, offering a claim of insanity—a claim supported by testimony offered by defense counsel but rejected by the jury.

## II

1. It may be helpful to approach the issues presented by this appeal with the perspective of history.

At common law, unlawful homicides were divided into two classes, murder and manslaughter, depending on whether the killing was with or without malice aforethought. Although the term malice aforethought was most probably intended to be applied literally when it was first introduced into the law of homicide, the courts soon converted it into a term of art. To the popular understanding of subjective malice was added an objective standard, by which negligence tantamount to recklessness might make a culpable homicide murder. The objective standard persists in the law,[2] but what we are primarily concerned with here is not so much the extension of "malice"[3] as the elimination of the literal significance of the word "aforethought." The courts held it sufficient to establish common law murder, subject to capital punishment, if the homicide was accompanied by the intention to cause death or grievous bodily harm, whether the slaying was calculated or only impulsive.

The nineteenth century ushered in a new approach. Beginning in 1794 with Pennsylvania, state legislatures began to separate murder into two degrees, reserving the death penalty for the first degree. These statutes typically defined murder in the first degree as an intended killing, accompanied by premeditation and deliberation (as well as malice

that deliberation means a further thought upon the plan or design to kill. It must have been considered by the defendant Bernard Austin.

"It is your duty to determine from all of the facts and the circumstances which have been presented to you in this case that you may find surrounding the killing on April 24, some time between four-forty and five o'clock, whether there was any reflection and consideration amounting to deliberation by the defendant Bernard Austin. Now if there was such deliberation, even though it be of an exceedingly brief duration, that is in itself, so far as the deliberation is concerned, is sufficient. Because it is the fact of deliberation rather than the length of time it required that is important. Although some time, that is there must be some time to deliberate and to create in the

mind of the defendant Austin the premeditation and the deliberation. As I have told you before, the time itself may be in the nature of hours, minutes, or seconds. But there must be the deliberation and the premeditation." (Tr. 1727–1728.)

2. See, e. g., Lee v. United States, 72 App. D.C. 147, 150–151, 112 F.2d 46, 49–50 (1940).

3. See generally Perkins, *The Law of Homicide*, 36 J.CRIM.L. & CRIM. 391, 397–410 (1946); Wechsler & Michael, *A Rationale of the Law of Homicide: I*, 37 COLUM.L.REV. 701, 707 & n. 21 (1937); Note, *Premeditation and Mental Capacity*, 46 COLUM.L.REV. 1005, 1007–1008 (1946); HOLMES, THE COMMON LAW 51–63 (1938 ed.); HALL & GLUECK, CASES ON CRIMINAL LAW 83–85 (1940).

aforethought); murder in the second degree was defined residually to include all other unlawful homicides with malice aforethought. In 1901 Congress passed such a statute for the District of Columbia. D.C. Code §§ 22–2401, 22–2403 (1961).

As we have noted:

Statutes like ours, which distinguish deliberate and premeditated murder from other murder, reflect a belief that one who meditates an intent to kill and then deliberately executes it is more dangerous, more culpable or less capable of reformation than one who kills on sudden impulse; or that the prospect of the death penalty is more likely to deter men from deliberate than from impulsive murder. The deliberate killer is guilty of first degree murder; the impulsive killer is not. [Bullock v. United States, 74 App.D.C. 220, 221, 122 F.2d 213, 214 (1941)] [4]

The reports reflect the effort of some courts to carry out the legislative conception, by interpreting "deliberation" to call for elements which the word normally signifies—that the determination to kill was reached calmly and in cold blood rather than under impulse or the heat of passion [5] and was reached some appreciable time prior to the homicide. The more widespread judicial tendency was marked by a restrictive reading of the statutory terms. "The statutory scheme was apparently intended to limit administrative discretion in the selection of capital cases. As so frequently occurs, the discretion which the legislature threw out the door was let in the window by the courts." [6]

Judge, later Justice, Cardozo, in a memorable 1928 address,[7] voiced his concern over the judicial attenuation of premeditation and deliberation. He spoke against the background of the New York experience, where, although the courts had abandoned their early statement that it sufficed if intention preceded the act though the act followed instantly,[8] they held that the time for deliberation need not be long, and seconds might suffice, provided there was time for a choice to kill or not to kill.[9] Judge Cardozo said:

There can be no intent unless there is a choice, yet * * * the choice without more is enough to justify the inference that the intent was deliberate and premeditated. The presence of a sudden impulse is said to mark the dividing line, but how can an impulse be anything but sudden

---

4. In addition see generally Weihofen & Overholser, *Mental Disorder Affecting the Degree of a Crime*, 56 YALE L.J. 959, 969–975 (1947); Brenner, *The Impulsive Murder and the Degree Device*, 22 FORDHAM L.REV. 274, 275–288 (1953); Keedy, *A Problem of First Degree Murder: Fisher v. United States*, 99 U.PA. L.REV. 267, 269–272 (1950); Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder*, 97 U.PA.L. REV. 759 (1949); Wechsler & Michael, *supra* note 3, at 703–707; Knudson, *Murder By the Clock*, 24 WASH.U.L.Q. 305, 308–344 (1939).

5. See, *e. g.*, State v. Kotovsky, 74 Mo. 247, 249–50 (1881): "Deliberation is also premeditation, but is something more. It is not only to think of beforehand, which may be but for an instant, but the inclination to do the act is considered, weighed, pondered upon, for such a length of time after a provocation is given, as the jury may find was sufficient for the blood to

cool. One in 'a heat of passion' may premeditate without deliberating. Deliberation is only exercised in a 'cool state of the blood.' * * *" See also State v. Speyer, 207 Mo. 540, 106 S.W. 505 (1907); Winton v. State, 151 Tenn. 177, 268 S.W. 633 (1925); Torres v. State, 39 N.M. 191, 43 P.2d 929, 931 (1935) ("deliberation * * * involves a thinking over with calm and reflective mind, or involves a fixed and settled purpose and coolness of mind * * *.")

6. Wechsler & Michael, *supra* note 3, at 709.

7. "What Medicine Can Do for Law", reprinted in LAW AND LITERATURE, 70, 96–101 (1931).

8. People v. Clark, 7 N.Y. 385, 394 (1852); Leighton v. People, 88 N.Y. 117, 120 (1882).

9. People v. Majone, 91 N.Y. 211 (1883); People v. Gaudagnino, 233 N.Y. 344, 135 N.E. 594 (1922).

when the time for its formation is measured by the lapse of seconds? Yet the decisions are to the effect that seconds may be enough. \* \* \* The present distinction is so obscure that no jury hearing it for the first time can fairly be expected to assimilate and understand it. I am not at all sure that I understand it myself after trying to apply it for many years and after diligent study of what has been written in the books. Upon the basis of this fine distinction with its obscure and mystifying phraseology, scores of men have gone to their death.

In 1937 we abandoned an earlier conception that deliberation and premeditation may be instantaneous,[10] and held, in Bostic v. United States,[11]

> "that some appreciable time must elapse in order that reflection and consideration amounting to deliberation may occur."

This change in rule was reiterated in Bullock v. United States, already quoted, where the court, holding the evidence insufficient to support a conviction of first degree murder, stated, 74 App.D.C. at 221, 122 F.2d at 214: "There is nothing deliberate and premeditated about a killing which is done within a second or two after the accused first thinks of doing it \* \* \*." These

expressions were quoted with approval as recently as Frady v. United States, 121 U.S.App.D.C. 78, 90 nn. 9 & 10, 96, 348 F.2d 84, 96 nn. 9 & 10, 102, cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965).

In Fisher v. United States, 328 U.S. 463, 469–470 n. 3, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), the Supreme Court quoted with approval the trial court's general instructions[12] wherein premeditation and deliberation were defined carefully, so as to include an instruction that deliberation requires "that an appreciable time elapse between formation of the design and the fatal act within which there is, in fact, deliberation." The Supreme Court commented, 328 U.S. at 470, 66 S.Ct. at 1322: "The necessary time element was emphasized and the jury was told that premeditation required a preconceived design to kill, a 'second thought.'"

Recent legislation has given the jury discretion to fix life imprisonment rather than death as the punishment for murder in the first degree. D.C.Code § 22–2404 (Supp. V, 1966). Yet murder in the first degree is still punishable by death, with a minimum term of life. Serious students of the problem have suggested that the legislatures change this approach and eliminate degrees of

---

10. Aldridge v. United States, 60 App.D.C. 45, 46, 47 F.2d 407, 408, rev'd on other grounds, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931).

11. 68 App.D.C. 167, 170, 94 F.2d 636, 639 (1937), cert. denied, 303 U.S. 635, 58 S. Ct. 523, 82 L.Ed. 1095 (1938).

12. "Then, there is the element of premeditation. That is, giving thought, before acting, to the idea of taking a human life and reaching a definite decision to kill. In short, premeditation is the formation of a specific intent to kill.

"Deliberation, that term of which you have heard much in the arguments and one of the elements of murder in the first degree, is consideration and reflection upon the preconceived design to kill; turning it over in the mind; giving it second thought.

"Although formation of a design to kill may be instantaneous, as quick as thought itself, the mental process of deliberating upon such a design does require that an appreciable time elapse between formation of the design and the fatal act within which there is, in fact, deliberation.

"The law prescribes no particular period of time. It necessarily varies according to the peculiar circumstances of each case. Consideration of a matter may continue over a prolonged period—hours, days, or even longer. Then again, it may cover but a brief span of minutes. If one forming an intent to kill does not act instantly, but pauses and actually gives second thought and consideration to the intended act, he has, in fact, deliberated. It is the fact of deliberation that is important, rather than the length of time it may have continued."

murder in classifying the offense,[13] but we must apply the statute as it stands. The need for careful attention to the requirement of premeditation and deliberation, and for clear distinction between the first and second degrees of murder, remains a cardinal tenet of our jurisprudence.

2. This historical review underscores our concern over three aspects of the court's instruction on first degree murder. The rulings of this court and the Supreme Court (in *Fisher*) establish the propriety of the defense request for a charge that the design of the accused to kill must have preceded his actions by an "appreciable" period of time before deliberation can be found. The Government contends that this error was not prejudicial because, as is clearly established by the cases,[14] the crux of the issue of premeditation and deliberation is not the time involved but whether defendant did engage in the process of reflection and meditation.[15] Certainly the charge should focus primarily on the defendant's actual thought processes in terms of meditation and conscious weighing of alternatives. The "appreciable time" element is subordinate, necessary for but not sufficient to establish deliberation.[16] Yet the "appreciable time" charge is a meaningful way to convey to the jury the core meaning of premeditation and deliberation and for that reason should be given, at least where specifically requested by the defense.[17] Moreover, the court's refusal so to instruct was compounded here by the charge that the time to deliberate "may be in the nature of hours, minutes *or seconds.*" As *Bostic* and *Bullock, Fisher* and *Frady,* all make clear, no particular length of time is necessary for deliberation, and the time required need not be longer than a span of minutes. But none of our post-*Bostic* opin-

13. The draftsmen of the *Model Penal Code* recommend abandoning the degree device. They comment that it was developed to avoid the mandatory imposition of the death penalty in all cases of undifferentiated "murder", and that now capital punishment is not automatic even for "first degree" murders. They propose that "degrees" should be taken into account in sentencing, and point out that there are cases where extreme depravity is revealed by a murder on impulse, without extenuating circumstances. The Code also suggests reducing even some premeditated homicides from murder to manslaughter if they are the product of deep emotional disturbance:

"* * * we think it plain that the case for a mitigated sentence does not depend on a distinction between impulse and deliberation; the very fact of long internal struggle may be evidence that the actor's homicidal impulse was deeply aberrational, far more the product of extraordinary circumstances than a true reflection of the actor's normal character, as, for example, in the case of mercy killings, suicide pacts, many infanticides and cases where a provocation gains in its explosive power as the actor broods about his injury." MODEL PENAL CODE § 201.6, comment at 70 (Tent. Draft No. 9, 1959).

14. This court has consistently pointed out that no particular length of time is necessary for deliberation, and it is not the lapse of time itself which constitute deliberation but the reflection and turning over in the mind of the accused concerning his existing design and purpose to kill. See, *e. g.,* in addition to *Bostic, Bullock* and *Frady,* discussed *supra,* Thomas v. United States, 81 U.S.App.D.C. 314, 158 F.2d 97 (1946), cert. denied, 331 U.S. 822, 67 S.Ct. 1303, 91 L.Ed. 1838 (1947).

15. The Government argues that the instruction as given "implicitly includes the concept of an appreciable time lapse." No reason is advanced why the judge might properly have refused the requested instruction. The judge did not even use the phrase "turning over in the mind," discussed in Weakley v. United States, 91 U.S.App.D.C. 8, 198 F.2d 940 (1952). His phrase "a further thought upon the plan or design to kill" would also apply to an additional but virtually simultaneous thought.

16. See, *e. g.,* Sabens v. United States, 40 App.D.C. 440, 444 (1913); Bullock v. United States, 74 App.D.C. 220, 122 F. 2d 213 (1941); Note, 21 MD.L.REV. 349 (1961); Wechsler & Michael, *supra* note 3, at 707–09.

17. *Cf.* cases cited in note 14 *supra*; McAffee v. United States, 70 App.D.C. 142, 105 F.2d 21 (1939); United States v. Wilson, 178 F.Supp. 881 (D.D.C.1959).

ions sanctions the reference to "or seconds" injected by the trial judge. The obvious problem with such a reference is that it tends to blur, rather than clarify, the critical difference between impulsive and deliberate killings.

Finally, we note that after giving this misleading first degree instruction, the court offered only a skimpy explanation of second degree murder.[18] Our concern is that there was no straightforward explanation to the jury of the difference between the two degrees of murder—that first degree murder, with its requirement of premeditation and deliberation, covers calculated and planned killings, while homicides that are unplanned or impulsive, even though they are intentional and with malice aforethought, are murder in the second degree.

In homespun terminology, intentional murder is in the first degree if committed in cold blood, and is murder in the second degree if committed on impulse or in the sudden heat of passion. These are the archtypes, that clarify by contrast. The real facts may be hard to classify and may lie between the poles. A sudden passion, like lust, rage, or jealousy, may spawn an impulsive intent yet persist long enough and in such a way as to permit that intent to become the subject of a further reflection and weighing of consequences and hence to take on the character of a murder executed without compunction and "in cold blood". The term "in cold blood" does not necessarily mean the assassin lying in wait, or the kind of

murder brilliantly depicted by Truman Capote in *In Cold Blood* (1965). Thus the common understanding might find both passion and cold blood in the husband who surprises his wife in adultery, leaves the house to buy a gun at a sporting goods store, and returns for a deadly sequel. The analysis of the jury would be illuminated, however, if it is first advised that a typical case of first degree is the murder in cold blood; that murder committed on impulse or in sudden passion is murder in the second degree; and then instructed that a homicide conceived in passion constitutes murder in the first degree only if the jury is convinced beyond a reasonable doubt that there was an appreciable time after the design was conceived and that in this interval there was a further thought, and a turning over in the mind —and not a mere persistence of the initial impulse of passion.

The court did not give an instruction on manslaughter, but none was requested. An unlawful killing in the sudden heat of passion—whether produced by rage, resentment, anger, terror or fear—is reduced from murder to manslaughter only if there was adequate provocation, such as might naturally induce a reasonable man in the passion of the moment to lose self-control and commit the act on impulse and without reflection. See Bishop v. United States, 71 App.D.C. 132, 136–137, 107 F.2d 297, 302–303 (1939). There is no contention before us of adequate provocation, and so appellant's crime is murder. The issue is, what degree of murder.

---

18. On second degree murder the court charged in essence: "Now if you find that the killing was one with malice but without premeditation and deliberation, you will then have for consideration the lesser included offense of murder in the second degree. * * *

   *    *    *    *    *

  "In other words, murder in the second degree is the unlawful killing of another, with malice aforethought. Murder in the second degree may be committed either with or without any purpose or intent to kill, if it is accompanied by malice, as I

have previously defined malice to you." (Tr. 1730).

  The trial judge did not make the mistake of indicating that second degree murder meant an absence of intent to kill, as was done in Weakley v. United States, 91 U.S.App.D.C. 8, 198 F.2d 940 (1952). But we do think the cold blood—hot blood distinction discussed in the text provides an instruction more understandable to the jury as to the kind of intentional killing that constitutes second degree as contrasted with first degree murder.

3. We do not pursue our consideration of murder instructions assailed by appellant for we are of the view that the trial court erred by not granting appellant's motion for acquittal on the first degree murder charge at the conclusion of the Government's case. A motion for acquittal must be granted when the evidence, viewed in the light most favorable to the Government, is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime.[19] We consider this issue on the basis of the evidence as it stood at the conclusion of the Government's case, related above.[20] Since the issue must be determined on the case as it stood when the prosecution rested, we do not discuss the testimony, adduced by the defense in support of the claim of insanity, as to appellant's utterances after indictment during the course of an interview at St. Elizabeths Hospital while under hypnosis and sodium amytal, nor do we have occasion to consider either the defense contention of inherent unreliability of such testimony on such subjects as time and sequence, or the contention that in the interest of justice appellant is entitled to separate trials, first on the issue of the commission of the offense, and second on the issue of mental responsibility.

In our opinion the Government's evidence was insufficient to warrant submission to the jury of the issue of premeditation and deliberation. The police produced and the prosecutor presented ample evidence of intent to kill and malice aforethought—putting to one side appellant's claim of insanity. Indeed there was evidence of a particularly frightful and horrible murder, of a crime that was murder at common law and is murder under our statute.

The frightful facts were certainly not glossed over by counsel—neither by the prosecutor seeking to convict, nor by the defense counsel whose pursuit of a verdict in effect finding defendant committed the act but was insane[21] was likewise advanced by intensifying the awful horror of the crime.

The facts of a savage murder generate a powerful drive, almost a juggernaut for jurors, and indeed for judges, to crush the crime with the utmost condemnation available, to seize whatever words or terms reflect maximum denunciation, to cry out murder "in the first degree." But it is the task and conscience of a judge to transcend emotional momentum with reflec-

19. *E. g.*, Hiet v. United States, 124 U.S. App.D.C. 313, 365 F.2d 504 (1966) (opinion of Prettyman, J.); Cephus v. United States, 117 U.S.App.D.C. 15, 324 F.2d 893 (1963); Campbell v. United States, 115 U.S.App.D.C. 30, 316 F.2d 681 (1963); Cooper v. United States, 94 U.S. App.D.C. 343, 218 F.2d 39 (1954); Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

20. In our view an accused who puts on a defense to a first degree murder case does not thereby "waive" his earlier motion for acquittal, or expose himself to a death penalty which the Government was not entitled to pursue in view of the fact that at the close of the prosecution's case the defendant was entitled to an acquittal of first degree murder because the evidence adduced by the prosecution was not sufficient to permit a reasonable man to find that the elements of first degree murder existed beyond a reasonable doubt. See Crawford v. United States, 126 U.S.App. D.C. 156, 375 F.2d 332, 334 (1967). Compare Cephus v. United States, *supra* note 19.

21. The verdict of "not guilty by reason of insanity" is "in some measure not unlike the Scottish verdict of guilty but insane, for it 'presupposes a determination that the accused has committed the criminal act with which he is charged' and has no defense other than insanity." King v. United States, 125 U.S.App.D.C. 318, 372 F.2d 383, 396 (1966). Compare State ex rel. La Follette v. Raskin, Wis., 150 N.W.2d 318 (May 9, 1967), where the Wisconsin Supreme Court provided for submission of the insanity issue to the jury, not in terms of guilty or not guilty, but as a factual question, whether defendant was insane at the time he committed the act.

tive analysis. The judge is aware that many murders most brutish and bestial are committed in a consuming frenzy or heat of passion, and that these are in law only murder in the second degree. The Government's evidence sufficed to establish an intentional and horrible murder—the kind that could be committed in a frenzy or heat of passion. However the core responsibility of the court requires it to reflect on the sufficiency of the Government's case. We conclude that, making all due allowance for the trial court's function, but applying proper criteria as to the elements of murder in the first degree, the Government's evidence in this case did not establish a basis for a reasoned finding, surpassing speculation, that beyond all reasonable doubt this was not murder committed in an orgy of frenzied activity, possibly heightened by drink, but the act of "one who meditates an intent to kill and then deliberately executes it" (see Bullock v. United States, *supra,* 74 App.D.C. at 221, 122 F.2d at 214).

That appellant used a knife to accomplish the murder is not probative of premeditation and deliberation because he did not procure it specifically for that purpose but rather carried it about with him as a matter of course. See United States v. Wilson, *supra,* note 17, 178 F.Supp. at 885. The violence and multiple wounds, while more than ample to show an intent to kill, cannot standing alone support an inference of a calmly calculated plan to kill requisite for premeditation and deliberation, as contrasted with an impulsive and senseless, albeit sustained, frenzy.[22] That there was a half-hour period (4:30 a. m. until 5:00 a. m.) during which appellant had ample time to premeditate and deliberate is not evidence that appellant actually did cogitate and mull over the intent to kill. Finally the Government was not able to show any motive for the crime or any prior threats or quarrels between appellant and deceased which might support an inference of premeditation and deliberation. Thus the jury could only speculate and surmise, without any basis in the testimony or evidence, that appellant acted with premeditation and deliberation. The office of the motion for acquittal is precisely to avoid such improper and unfounded conjecture.

The claim that appellant acted not merely intentionally but with deliberation when he stabbed the unfortunate woman to death is manifestly not established beyond a reasonable doubt by evidence showing that he acted with

---

22. Compare United States v. Wilson, *supra* note 17, where Judge Holtzoff did not consider the firing of four shots as evidence of premeditation and deliberation. See also People v. Jiminez, 95 Cal. App.2d 840, 214 P.2d 15 (Dist.Ct.App. 1950) (eight stab wounds in chest and back inflicted with pocket knife); People v. Caldwell, 43 Cal.2d 864, 279 P.2d 539 (1955) (where Traynor, J., noted that multiple acts of violence on the victim would not alone be sufficient to show the killing was the result of deliberation). Impulsive murders are not in the first degree though they may on occasion reflect "even more diabolical cruelty and ferocity than * * * murders premeditated." 3 STEPHEN, HISTORY OF THE CRIMINAL LAW 94 (1883). One of Stephen's examples of horrible but impulsive murder is the man who makes advances to a girl, is repelled, and wilfully but instantly cuts her throat. That the slaying was violent may of course be taken into account if there is other evidence which is probative of deliberation, see Frady v. United States, 121 U.S.App.D.C. 78, 95, 348 F.2d 84, 101 (opinion of Miller, J.), cert. denied, 382 U.S. 909, 86 S. Ct. 247, 15 L.Ed.2d 160 (1965). Appellee relies on State v. Snowden, 79 Idaho 266, 313 P.2d 706, 711 (1957), and State v. Burris, 80 *Idaho* 395, 331 P.2d 265 (1958). But Idaho apparently follows the rule which we repudiated in *Bostic* and *Bullock,* that the intention and act of killing "may be as instantaneous as successive thoughts of the mind." State v. Shuff, 9 Idaho 115, 72 P. 664, 668 (1903).

This case before us is utterly lacking, of course, in the type of evidence before the court in Bishop v. United States, 71 App.D.C. 132, 137, 107 F.2d 297, 303 (1939), where immediately after the murder appellant said "That's the way to fix them." There the appellant dragged his wife 30 or 40 feet to the place where he had left his murder weapon, not from the death scene to a place of concealment.

deliberation afterward, in an effort to avoid detection and punishment—dragging the victim on the point of death down to the river; then fleeing; then feigning lack of any knowledge when the officer arrived. These facts may intensify emotional recoil against appellant. But they do not provide a reasoned basis for concluding beyond a reasonable doubt that the crime appellant sought to wash away, and run away from, was a crime he had committed not merely intentionally, in sustained frenzy or heat of passion, but beyond that with premeditation and deliberation!

### III

We have examined appellant's other claims of error, which relate primarily to the court's instructions on the insanity claim. Taking the instructions as a whole, see Redfield v. United States, 117 U.S.App.D.C. 231, 328 F.2d 532, cert. denied, 377 U.S. 972, 84 S.Ct. 1654, 12 L.Ed.2d 741 (1964), we do not find error "affecting substantial rights." Rules 52(a) and (b), Fed.R.Crim.P.

The issue then arises as to what remedy is appropriate to correct the court's error in failing to grant acquittal of first degree murder. Section 2106 of Title 28, U.S.Code, provides:

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court * * * and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

This provision of the 1948 Judicial Code is an outgrowth of a long line of Federal statutes,[23] similar in conception and purpose to numerous state laws, intended to liberate our appellate courts from the English common law rules restricting their authority. Ballew v. United States, 160 U.S. 187, 198–199, 16 S.Ct. 263, 40 L.Ed. 388 (1895).

The state courts, including courts governed by statutes virtually the same as Section 2106, have both long ago and recently held that although appellate courts have no power to alter a lawful sentence in the absence of express statutory authority, their general power to modify erroneous judgments authorizes reduction to a lesser included offense where the evidence is insufficient to support an element of the offense stated in the verdict. The court has either remanded with directions to enter the appropriate judgment of conviction of the lesser crime or has itself modified the judgment and remanded only for the re-imposition of sentence.[24]

23. See Bryan v. United States, 338 U.S. 552, 557–560, 70 S.Ct. 317, 94 L.Ed. 335 (1950).

24. See, e. g., reducing first to second degree murder where the evidence failed to establish premeditation or · deliberation, People v. Mendes, 35 Cal.2d 537, 219 P. 2d 1 (1950); People v. Bender, 27 Cal. 2d 164, 163 P.2d 8 (1945); State v. Gunn, 89 Mont. 453, 300 Pac. 212 (1931). Similar disposition has been made of other crimes. E. g., People v. Gaither, 173 Cal. App.2d 662, 343 P.2d 799 (Dist.Ct.App. 1959), cert. denied, 362 U.S. 991, 80 S.Ct. 1082, 4 L.Ed.2d 1023 (1960) (administration of poison, to attempt to administer); Ritchie v. State, 243 Ind. 614, 189 N.E.2d 575 (1963) (rape, to assault with intent); People v. Farrell, 146 Mich. 264, 109 N.W. 440 (1906) (first degree murder, to manslaughter); State v. Jackson, 198 Minn. 111, 268 N.W. 924 (1936) (second to third degree murder); People v. Monaco, 14 N.Y.2d 43, 248 N.Y.S.2d 41, 197 N.E.2d 532 (1964) (second degree murder, to first degree manslaughter); People v. Brown, 21 A.D.2d 738, 249 N. Y.S.2d 922 (4th Dep't 1964) ("attempted manslaughter," to second degree assault); State v. Porello, 138 Ohio St. 239, 34 N.E.2d 198 (1941) (first degree murder, to manslaughter); Kilpatrick v. State, 75 Okl.Cr. 28, 128 P.2d 246 (1942) (rape, to assault with intent); State v. Sorrentino, 31 Wyo. 129, 224 P. 420, 34 A.L.R. 1477 (1924) (second degree murder, to manslaughter).

Even without resort to statutory authority some appellate courts have exercised inherent supervisory power to cor-

See, *e. g.*, State v. Gunn, 89 Mont. 453, 300 P. 212 (1931), and Ritchie v. State, 243 Ind. 614, 189 N.E.2d 575 (1963), both cases of first impression in those states, where the court adopted this doctrine after careful consideration of the authorities. In *Gunn* the court, finding the evidence insufficient to establish premeditation and deliberation, modified the judgment from first to second degree murder. The state statute, like Section 2106, provided merely that a reviewing court could "reverse, affirm, or modify the judgment." Relying on the ruling in nine other states with the same statutory language, the court agreed that this enactment gave the court "the power to modify a judgment by reducing the degree of the offense to that which is sustained by the evidence." 300 P. at 217. The court pointed out that—

> the jury has determined that the killing was murder; the verdict of murder in the first degree necessarily implies the finding of all the essential elements of murder in the second degree, and defendant has had the benefit of a trial for that offense as fully as though the information had contained that charge.

The court concluded that "[t]his construction gives full force to the word 'modify'" as used in the statute. Ibid. This construction is in accord with the decided weight of authority,[25] as recently noted by the Indiana court in *Ritchie*.

In our view this established principle of American jurisprudence, which fleshes out the governing "bare bones" statute, is applicable in the federal courts exercising the authority conferred by Section 2106. We cite a lower court dictum to that effect in the footnote.[26] More significant, however, are the precedents in the Supreme Court and our own court which exemplify the same underlying authority albeit the context is not precisely the same. In *Ballew, supra*, involving a two-count indictment, for unlawfully withholding pension benefits and fraudulently accepting excessive compensation for pressing a pension claim, the jury rendered a general verdict of guilty as charged. The Court, applying the prohibitory statutes to the facts (withdrawal of the fee from the account of an illiterate pensioner) concluded that the verdict on the second count could stand but Congress did not intend such action also to constitute the prohibited "withholding" of a pension charged in the first count. It turned

---

rect criminal judgments by lowering convictions from first to second degree murder when the proof on premeditation and deliberation was inadequate. See, *e. g.*, Dinwiddie v. State, 202 Ark. 562, 151 S. W.2d 93 (1941); Simpson v. State, 56 Ark. 8, 19 S.W. 99 (1892); Forsha v. State, 183 Tenn. 604, 194 S.W.2d 463 (1946); State v. Braley, 224 Or. 1, 355 P.2d 467 (1960); *cf.* State v. Fields, 70 Iowa 196, 30 N.W. 480 (1886) (no evidence of intent to kill; first degree murder to manslaughter); Commonwealth v. Sterling, 314 Pa. 76, 170 A. 258 (1934) (dictum) (inherent as well as statutory authority).

25. We are aware of only one case denying the power to modify an unsupported criminal judgment to a lesser included offense. State v. O'Donnell, 176 Iowa 337, 157 N.W. 870 (1916).

Entirely distinguishable, of course, are the many cases expressing the settled rule that in the absence of explicit statutory authority, a *general power to modify* judgments does not give an appellate court authority to reduce a sentence imposed by the judge exercising the discretion conferred upon trial courts.

This principle was not disavowed by this court's en banc opinions in Coleman v. United States, 123 U.S.App.D.C. 103, 357 F.2d 563 (1965), and Frady v. United States, 121 U.S.App.D.C. 78, 348 F. 2d 84, cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965), where Section 2106 was invoked because of an error in the sentencing process which could not be remedied on a remand.

26. See United States v. Linnier, 125 F. 83, 86 (C.C.D.Neb.1903). United States v. Martini, 42 F.Supp. 502, 510 (S.D.Ala. 1941), is not directed to the same issue. There the court after granting judgment n. o. v. for insufficiency of the evidence refused to enter a judgment of guilt on a crime with elements quite different from the crime charged.

to the statute, the predecessor to Section 2106, as relieving it of the historic limitation on the authority of appellate courts, and ruled that "substantive justice" and the "nature of the error found" permitted it to remand for the entry of judgment on the second count alone. This section was relied on more recently in Tinder v. United States, 345 U.S. 565, 570, 73 S.Ct. 911, 913, 97 L.Ed. 1250 (1953), to "do justice as the case requires." There the Supreme Court was confronted with a defendant convicted of feloniously pilfering mail from letter boxes and sentenced to a 3-year term. The Court held a conviction for a felony unwarranted because the thefts involved property not alleged or shown to exceed $100 in value. The Court did not remand for a new trial, but instead it ruled that the interests of justice required merely that the cause be remanded for correction of the sentence.

In Isaac v. United States, 109 U.S. App.D.C. 34, 38, 284 F.2d 168, 172 (1960), this court exercised the power to avoid a new trial by ordering the entry of the judgment that the evidence demanded. There the jury was instructed that they could find the defendant guilty of first or second degree murder, not guilty by reason of insanity, or not guilty. The jury convicted of murder in the first degree. We found that there must have been a reasonable doubt about defendant's sanity, and thus the trial court erred in submitting the issue of murder to the jury. This court did not remand for new trial. We reasoned that since the jury had in fact considered whether the defendant had done the

act charged and concluded beyond a reasonable doubt that he had, the appropriate disposition was to remand for the entry of a judgment of not guilty by reason of insanity—a judgment which affirms that the accused has committed the objectionable act but is not criminally responsible.

■ In the case at bar although it did not adduce evidence sufficient to present to the jury the issues of premeditation and deliberation the Government adequately shouldered its obligation to demonstrate the other elements of murder, and the jury's verdict makes clear that it was convinced thereof beyond a reasonable doubt. In this context, it is our view that Section 2106 confers on a federal appellate court the power to modify a criminal judgment to reduce the conviction to that of a lesser included offense, where the evidence fails to support one element of the crime of which appellant was charged and convicted but sufficiently sustains all the elements of the included offense.[27]

■ This power should be exercised only when it is clear that no undue prejudice will result to the accused. We perceive no such possible prejudice. Appellant has had a fair adjudication of guilt on all elements of the crime of murder in the second degree. Any deficiencies in the instructions related to the elements of premeditation and deliberation and are thus immaterial in light of our disposition of the first degree murder verdict. Since this form of second degree murder is properly classified as a lesser included offense of the crime charged, and the jury could have explicitly returned this verdict, ap-

27. In Naples v. United States, 120 U.S. App.D.C. 123, 131–132, 344 F.2d 508, 516–517 (1964), we held that the jury could not return a verdict convicting a defendant of both first and second degree murder for the same homicide. The theory there was that conviction in the same verdict for both of these different crimes would be "contrary to the intent of the nineteenth century legal reforms which displaced undifferentiated common law murder." Since a verdict of murder in the second degree negatives a finding of premeditation and deliberation, the jury could not be permitted in the same verdict to recite that the murder was in cold blood. But here there is no inconsistency. The first degree verdict does include a finding of all the elements of second degree murder beyond a reasonable doubt, i. e. that appellant committed a homicide with malice aforethought and intention to effect death, and without provocation or justification.

pellant had notice of his potential liability for this crime. The essence of appellant's defense was a claim of insanity. We do not see how defense presentation might have been altered if the first degree charge had been dropped at the close of the Government's evidence.

It is our view, however, that optimum application of Section 2106 bids an appellate court take into account that its remoteness may not provide as good a vantage point as the trial court's proximity for detecting possibilities of prejudice in a particular case. We are confident that the conscientious trial judge, upon being informed of our views as to the salient issues discussed, will dutifully address himself to that question. Therefore, our remand order will permit the trial judge to grant a new trial if he determines that this alternative would better serve the interest of justice.

The cause is remanded to the District Court with directions to enter a judgment of guilty of murder in the second degree and sentence accordingly, unless the District Court determines that a new trial is in the interest of justice.

So ordered.

BASTIAN, Senior Circuit Judge:

I concur in Judge Leventhal's opinion and the remand. I wish to add the following few words for emphasis.

No one should equate our action in this case with an intention to take a step in the direction of holding that we have the power of review of sentences imposed by the District Court. As Judge Leventhal points out, appellate courts "have no power to alter a lawful sentence in the absence of express authority."

Judge Leventhal has asked me to note that he endorses both the content and form of this concurrence-for-emphasis.

DANAHER, Circuit Judge (dissenting):

At the point where my colleagues abandon their "consideration of murder instructions assailed by the appellant," they decide "that the trial court erred by not granting appellant's motion for acquittal on the first-degree murder charge at the conclusion of the Government's case." I disagree.

My colleagues say thus that "the Government's evidence was insufficient to warrant submission to the jury of the issue of premeditation and deliberation." Again I disagree, for in my study of the record I am convinced that the District Judge properly submitted the issues to the jury. On the same evidence, my colleagues find themselves satisfied that Austin "has had a fair adjudication of guilt on all elements of the crime of murder in the second degree."

My colleagues outline what they say was the "Government's evidence." Omitted entirely from that recital are the many inferences which the trial judge was free to draw from the facts he was entitled to find at the close of the Government's case in chief. He was bound to view that case in the light most favorable to the Government.

With the case thus appraised, the trial judge could have concluded that a reasonable juror could have had no reasonable doubt that (1) Austin had murdered Nettie Scott, (2) he had done so in furtherance of a premeditated and positive design to kill, and (3) he had acted *deliberately*. I think Austin's counsel found himself of like mind even as, for the record, he moved for acquittal as to murder in the first degree. Since I believe the trial judge ruled correctly, Part I will deal solely with the facts and the inferences deducible therefrom as developed during the Government's *prima facie* case.

I

The judge looking back over the case would readily recall that after the prosecutor had outlined the scope of the case he intended to present, Austin's trial attorney addressed the jury. Here is what he said:

"This is a tragic and frightful case. What happened was horrible. You

have heard the details from [the prosecutor]. *I am here under authority from my client to tell you that he does not deny that he did any of these things. He admits that he did them, and we say this to you at the very outset.* All of the questions of whose blood was where, and who did what, are in reality out of this case. There is no attempt to evade or to deny that he did these things.

"*Neither he nor I wish to leave any implication in your minds that there is any doubt that Bernard Austin did these things.*" [1] (Emphasis added.)

And so the trial got under way, with the Government calling as its first witness a Mrs. Riley, a waitress at Goldie's Tavern. There she had seen the victim, Nettie Scott, when she entered about 10:30 P.M., and there she later saw Austin.

Some time after 2 A.M., Mrs. Riley went over to an "after hours spot," operated by one Turner. Upon arrival Mrs. Riley noticed that Nettie Scott was seated with many others at a large table. Patrons were free to sit down at that table or to move about, and in due course, Austin sat at the table. Nettie Scott was "having a good time, drinking" and, the witness said, was under the influence of liquor, "high." At that table also was a woman who broke her thumbnail. Austin offered to cut off the hanging nail. He took out a pocket knife, and cut off the broken nail. Austin remarked "Look, the knife is so sharp she didn't even feel it," and he put the knife back in his pocket.

Mrs. Riley left Turner's between 4:30 and 5 A.M., but Nettie Scott had preceded her, departing with one Mabel Proctor, "between 4:10 and 4:20."

Mrs. Riley had known Austin for about a year. He did not appear to be "drunk" or "high" but rather, to be in good control of himself. As a waitress in the liquor establishment, she had had "considerable opportunity" to judge whether or not a person was intoxicated, and Austin "did not appear to be." [2]

Mabel Proctor was the next witness. She had seen Nettie Scott at Goldie's and later at Turner's. The witness said she began to doze whereupon Nettie said "Mickey, I will take you home." Austin came to her, pulled her up and said "Nettie and me are going to take you home." She and the victim and the killer left Turner's and got into a white panel truck which Austin drove. The three left Turner's between 4:10 and 4:15 A.M., stopped at a restaurant and dropped off the Proctor woman between 4:30 and 4:40 A.M.

When these three people reached the restaurant and Nettie Scott had jumped out of the truck, Austin undertook to put his hands "back there" and the witness commanded ."Take your hands off of me." Mabel Proctor testified that she was "stone sober that night" as she drinks "very little" and is "always sober."

Metropolitan Police Lt. Ritter had the rank of sergeant on April 24, 1964. About 5 o'clock that morning, he and Sgt. Klotz drove along Anacostia Parkway. In a nearby parking bay they saw a white panel truck with the door open on the passenger side. They saw clothing on the grass strip between the parking area and the roadway. Just then they saw a man coming up the bank from the

---

1. Defense counsel in his opening statement announced that the defense was to be insanity. Austin's attorney accordingly went on to outline the factors upon which he expected to base that defense. Of course no such evidence was adduced while the Government was establishing its *prima facie* case. I do not here discuss the evidence upon which Austin later relied, but the jury was clearly justified in rejecting the insanity defense. McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (*en banc*, 1962).

2. Appellant's counsel was later to argue in closing before the jury that there had been no evidence that whatever Austin drank had "significantly affected his behavior." He asked: "Why did two eyewitnesses one hour before the crime find him not intoxicated?"

river. He closed the door on the passenger side, ran around the front of the truck, jumped in and drove away. The officers were some 16 to 18 feet distant. Sgt. Klotz copied down the registration number of the truck, CF 4125, 1964 tags, and the police commenced their investigation. They saw a woman's brassiere, the clothing spattered with blood, and there was a large pool of blood in the grassy area. They went to the river bank and there saw a body floating.

The officers pulled from the river a nude female with only one piece of clothing around her neck. Stab wounds were immediately visible. The woman moaned, but presently died.

Ritter drove to the nearest patrol signal box and gave an alarm for the white panel truck. Presently other officers appeared. Over the radio came the report that the truck had been stopped in the 1300 block of Massachusetts Avenue, Southeast. There, upon arrival, Sgt. Klotz recognized the driver of the truck as the same man who had earlier come up the river bank. Klotz said to Austin "You are the man." Austin replied "What man?"

Then the testimony went:

"I said 'You are the man that I saw down by the river a little while ago.' He said 'You are crazy. I just came from my girl friend's house.' "

That statement, the witness testified, was made "in a belligerent tone of voice." The police officers had taken many photographs of the scene, and the witness identified each as the photographs were marked for identification.

The record shows that trial counsel informed the judge he had no objection to the photographs becoming full exhibits. "We are going to put them in," he said; "We want to put them in and we won't object as to identification." His purpose, he explained to the judge, was to demonstrate "the bizarre nature of the crime."

Each of the photographs was explained by the witness, one depicting "the marks that were on the ground and apparently where the body was drug [*sic*] and where the clothing was found."

It was brought out that the drag marks passed from a point on the embankment down to the river, in the very area from which the officers had first seen Austin running.

I may mention out of order that the photographs of the scene and the evidence elicited from the coroner had led defense counsel to certain conclusions which he submitted to the trial judge thus:

"Your Honor, may I bring this to your attention?

"This battle, I think the evidence is going to show that, took place over the course of many yards. She obviously was smashed in the face and sustained a broken nose.

"She may have been standing up at one point or laying [*sic*] down at another on her back, or forward. But the point I make from it is in the truck and some of it is through the area, all through there."

Let us turn to the testimony of the coroner. Dr. Rayford testified that Nettie Scott had been 5 feet 7 inches tall and had weighed 195 pounds. The exact cause of her death was hemorrhage from multiple stab wounds. A blood test revealed a .24 per cent of alcohol from which the witness concluded, the victim could have been considered well under the influence of alcohol. She had suffered a broken nose which, in the doctor's opinion, could have been caused by the blow of a human fist.

The doctor's examination revealed some 26 stab wounds resulting from the use of a sharp-bladed instrument. Additionally, the doctor had found at least 20 smaller wounds.

Finally, the doctor testified that the stab wounds could have been inflicted

by an assailant who used a knife of the type he had found in the victim's head. The assailant had struck his victim above the jaw angle in such fashion that the knife blade penetrated the cranium and broke off in the skull.

Previously, the woman had been stabbed in the area of her sexual organs. Carved on the victim's thigh was an intricate design, much resembling what the doctor called a "tic-tac-toe." That any such result could have been achieved, the testimony ran, the victim must have been recumbent and passive by that time. It fairly could have been inferred by the trial judge from all the evidence and from the doctor's testimony, as it was by defense counsel, that this appellant had fought with his stupefied victim, had knocked her out, had stripped her of her clothing and sexually assaulted her. That all of these events must have involved a substantial period of time would seem beyond question. Finally, Austin had to take whatever time was necessary to drag her body to the river and to throw her in as he sought to drown her.

Against that background the judge denied trial counsel's motion for acquittal when the Government rested. My colleagues say that the ruling of the District Judge constitutes reversible error. I reject that conclusion.

Austin's trial counsel in light of facts which he took as established had obviously drawn certain inferences, as is apparent from his statement to the judge, *supra,* concerning the "battle."[3] This victim, Nettie Scott, was tall for a woman and heavy by some standards, and possibly strong. Her assailant had already been careless with the use of his hands upon the other woman, to the point of reproof by the witness Proctor. Austin had driven the panel truck to a parking bay with a single entrance from the parkway. The door on the passenger side had been opened. That the victim after getting out had resisted whatever advances Austin might have made toward her might reasonably be inferred from the fact that her nose had been broken, with a human fist as the cause. That she engaged in a "battle," as defense counsel called it, with her assailant might reasonably be deduced from the trampled grass as depicted in the Government's exhibits.

Austin had earlier used and had in his pocket a sharp knife. He had to decide to take that knife from his pocket and to open it. That thought and that action without more resulted from deliberation. He had evolved a definite purpose to wield that knife upon the woman. His plan and his actions reflected his intent, deliberately pursued, the judge could have deduced. Stab wounds in the chest had led to massive bleeding. Austin had stabbed Nettie Scott no less than four times in the vicinity of her sexual organ. Over and over again the assailant stabbed and cut his victim, a total of more than fifty times, until she was helpless. The last blow from the knife had been into her skull where the blade broke off.

Seeing that she was still alive, determined to kill her, Austin dragged her body some thirty-five feet down the bank and into the river that as a last resort in the accomplishment of his purpose, she would drown.

Then he took flight, giving rise to an inference of consciousness of guilt. Apprehended within a few minutes, he lied to the arresting officers as to his earlier movements.

Only sketchily have I reviewed the salient facts and only briefly touched upon the inferences which the judge was free to draw from those facts. I submit that the judge could properly come to no other conclusion than that Austin had acted with that degree of deliberation which the law requires.[4]

---

3. Will it be said that the judge was precluded from like conclusions?

4. My colleagues' "cold blood" theory finds support in Capote's work, to be sure; the criteria I deem applicable derive from our case law.

It will be remembered that my colleagues find error in the ruling upon the motion for acquittal at the close of the Government's case. It was the duty of the judge at that point to determine credibility and the weight to be given to the evidence and the justifiable inferences to be drawn from the facts he deemed to have been established.[5] Thinking thus, upon all that had gone before, he readily could have concluded that Austin with premeditation had decided upon the steps he intended to take and with deliberation undertook to execute his plan. From the moment Austin reached into his pocket, took out his knife, opened it and commenced slashing and stabbing his victim, the successive steps might have required only a short time. But as his victim resisted him, kicked him, struggled for her life, Austin's purpose, deliberately conceived, was accentuated down to where his knife became lodged in her skull. He took one more step, finally. He had to drag that woman's dying body down to the river and throw it in. Deliberation? A "second thought"?

## II

D.C.CODE § 22–2401 (1961) in pertinent part provides:

"Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or [by certain means or in perpetrating certain offenses not here relevant] is guilty of murder in the first degree."

The defense called as its chief expert witness a Dr. LeGault who testified that at St. Elizabeths Hospital, by means of certain drugs and hypnotism, he had caused Austin to relive the events of the evening. The substance of the doctor's testimony at trial disclosed what he, as Austin's expert, had elicited from the appellant. His narration incuded Austin's statement that at Turner's, Austin had made a date with the victim to go to a tourist home to have intercourse. Nettie

Scott and Austin had dropped off "Mickey" at her home after which the victim changed her mind about going to the tourist home and asked to be taken to her own residence. (Instead, as we know, the couple wound up at the scene of the crime.) In the course of an argument there, Nettie had slapped him, he hit her and knocked her out. When she came to and tried to run, as Austin told the expert, he knocked her out again and raped her. She regained consciousness and threatened to notify the authorities. He said to her "You are not going to tell anybody on me —— —— cheating bitch, I will cut your heart out." Thereupon Austin drew out his knife, producing the results previously described. The expert's testimony as to what Austin had told him corroborated the Government's case.

I have said enough to disclose the state of the record against which the trial judge was to frame his instructions to the jury. He was not bound to consider what some courts in Missouri and Tennessee and New Mexico may have said. There was no occasion for him to rely upon text writers and commentators. His duty was to take account of the statute applicable in the District of Columbia and the decisional law evolved both in this Circuit and in the Supreme Court of the United States. There was no suggestion in any such source that there can be a murder in the first degree under our statute only if it be committed "in cold blood."

The trial judge could have seen, for example, that there is a distinction between what is an instantaneous killing and one which is deliberate and premeditated. My colleagues have omitted pertinent language which I supply in italics as follows:

"There is nothing deliberate and premeditated about a killing which is done within a second or two after the accused first thinks of doing it; *or, as*

---

5. Curley v. United States, 81 U.S.App.D.C. 389, 392, 393, 160 F.2d 229, 232, 233, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

*we think the evidence shows, instantaneously, as appellant interrupted in his quarrel, turned and fired."* (Emphasis added.)[6]

The trial judge here obviously knew that there had been no suggestion of an instantaneous killing. On the contrary, in addition to the facts to be found and the inferences to be drawn from the Government's case in chief, the defense itself had supplied its own version of both motive and action on the part of Austin.

The judge knew in considering the adequacy of time for deliberation that there must be "an appreciable period." But he also knew that such period must be one which in his judgment, "under the circumstances, was sufficient time for deliberation."[7] The judge undoubtedly knew that the Supreme Court had considered the state of the law in this jurisdiction in Fisher v. United States, 328 U.S. 463, 470, 66 S.Ct. 1318, 1322, 90 L.Ed. 1382 (1946), where the Court said:

"The instructions, we think, were clear, definite, understandable and applicable to the facts developed by the testimony. We see no error in them."

The instructions which the Court there had approved as here pertinent appear in 328 U.S. at 469, 66 S.Ct. at 1321. Speaking of the particular time or the period within which an assailant may give a "second thought" to his intended act, the approved instructions included the following:

"The law prescribes no particular period of time. It necessarily varies according to the peculiar circumstances of each case. Consideration of a matter may continue over a prolonged period—hours, days, or even longer. Then again, it may cover but a brief span of minutes. If one forming an intent to kill does not act instantly, but pauses and actually gives second thought and consideration to the intended act, he has, in fact deliberated. It is the fact of deliberation that is important, rather than the length of time it may have continued."

### III

As will have been observed, I discussed in Part I the basis upon which, in my view, the trial judge had correctly applied the rule so readily discernible from our opinions. Without even considering defense evidence thereafter adduced,[8] I would not disturb his decision that the Government had made out a *prima facie* case, and the motion for acquittal then made was properly denied.

In Part II, I have discussed what I deem to be the governing principles and the background for the trial judge's denial of the motion for acquittal after the defense had put on its evidence which, as previously noted, tended to corroborate what was already a sufficient case.

6. Bullock v. United States, 74 App.D.C. 220, 221, 122 F.2d 213, 214 (1941). My colleagues omitted from their quotation from *Bullock* the language upon which all three judges agreed. The author of the opinion writing for himself only in the first portion of his text nevertheless exhibited in note 4 the portion of the instructions on deliberation which the majority approved.

7. Bostic v. United States, 68 App.D.C. 167, 171, 94 F.2d 636, 640 (1937), cert. denied, 303 U.S. 635, 58 S.Ct. 523, 82 L.Ed. 1095 (1938). There, Judge Justin Miller abstracted the principles from various cases from which he concluded "that no

particular length of time is necessary for deliberation," 68 App.D.C. 169, 94 F.2d 638, and that period of time "does not require the lapse of days or hours, or even minutes." 68 App.D.C. 170, 94 F. 2d 639. Cf. Frady v. United States, 121 U.S.App.D.C. 78, 348 F.2d 84, cert. denied, 382 U.S. 909 (1965).

8. But see United States v. Gosser, 339 F. 2d 102, 110 (6 Cir. 1964), cert. denied, 382 U.S. 819, 86 S.Ct. 44, 15 L.Ed.2d 65 (1965) ; Jaben v. United States, 349 F.2d 913, 916, 917 (8 Cir. 1965) ; Hughes v. United States, 320 F.2d 459, 462 (10 Cir.), cert. denied, 375 U.S. 966, 84 S.Ct. 483, 11 L.Ed.2d 415 (1963).

In light of the record as it then stood, the judge instructed the jury. He made it clear that all essential elements must be proved to the satisfaction of the jury beyond a reasonable doubt.[9] And so, in light of our law as applied to our statute the judge's instructions went thus:

"Now as to the fourth element of first degree murder, that the defendant acted with premeditation and with deliberation. Now premeditation is the formation of the intent or plan to kill; the formation of a postitive design to kill. Deliberation means further, or to put it in another way—I am speaking now of deliberation—that deliberation means a further thought upon the plan or the design to kill. It must have been considered by the defendant Bernard Austin.

"It is your duty to determine from all of the facts and the circumstances which have been presented to you in this case that you may find surrounding the killing on April 24, some time between four-forty and five o'clock, whether there was any reflection and consideration amounting to deliberation by the defendant Bernard Austin. *Now if there was such deliberation, even though it be of an exceedingly brief duration, that is in itself, so far as the deliberation is concerned, is sufficient. Because it is the fact of deliberation rather than the length of time it required that is important.* Although some time, that is there must be some time to deliberate and to create in the mind of the defendant Austin the premeditation and the deliberation. As I have told you before, the time itself may be in the nature of hours, minutes, or seconds. But there must be the deliberation and the premeditation." (Emphasis added.)

As the Supreme Court said in *Fisher, supra,* I think the instructions were clear, definite, understandable and applicable to the facts developed by the testimony.[10] I would affirm the judgment of the District Court.

9. After a trial running through some three weeks, the jury took the case at 11:55 A.M. on November 2, 1965. It returned its verdicts that same day at 2:35 P.M., finding Austin guilty of murder in the first degree and recommending as a penalty, imprisonment for life.

The Government had expressly informed the jury that it did not ask for the death penalty.

It would seem beyond peradventure that the jury had no doubt whatever concerning Austin's guilt.

10. In my appraisal, no member of that jury could possibly have failed to understand that sufficient time meant adequate time, as we have been discussing the term. Interpolation of the single word "appreciable" could have added nothing to the clarity of the instructions as given. It is fundamental that a party is not entitled to instructions in language chosen by him if the instructions as given are adapted to the issues and adequate for the guidance of the jury.

Nothing that I can see in our cases lays down the rule that for a murder to be in the first degree, it must have been committed "In Cold Blood," as Truman Capote has styled his work. But if that work is to be a reference, we might turn to page 330 and read:

"However, even an attorney of moderate talent can postpone doomsday year after year, for the system of appeals that pervades American jurisprudence amounts to a legalistic wheel of fortune, a game of chance, somewhat fixed in favor of the criminal, that the participants play interminably, first in the state courts, then through the Federal courts until the ultimate tribunal is reached—the United States Supreme Court. But even defeat there does not signify if petitioner's counsel can discover or invent new grounds for appeal; usually they can, and so once more the wheel turns, and turns until, perhaps some years later, the prisoner arrives back at the nation's highest court, probably only to begin again the slow cruel contest. But at intervals the wheel does pause to declare a winner—or, though with increasing rarity, a loser.
* * *"