FURTHER ORDERED that Charles M. James III, Esquire is hereby reinstated to the Bar of the District of Columbia subject to the condition outlined above. Failure to fully comply with the above condition may result in revocation of this reinstatement order. See D.C. Bar R. XI, § 16(f).

David EWING and Gloria
Dunn, Appellants,

v.

UNITED STATES, Appellee.

Nos. 06–CF–951, 06–CF–1100.

District of Columbia Court of Appeals.

Argued March 30, 2011.
Decided Feb. 9, 2012.

Jonathan Willmott, for appellant David Ewing.

David H. Reiter, for appellant Gloria Dunn.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, and Elizabeth Trosman and John P. Mannarino, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and RUIZ, Associate Judge, Retired.*

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

GLICKMAN, Associate Judge:

Appellants David Ewing and Gloria Dunn were convicted after a jury trial of first-degree premeditated murder while armed, second-degree murder (as a lesser-included offense of felony murder), arson (two counts), and tampering with physical evidence.[1] They primarily challenge their first-degree murder convictions. Dunn argues there was insufficient evidence of premeditation and deliberation, and claims the aiding-and-abetting instruction allowed the jury to convict her of first-degree murder without finding those elements present in her case. Ewing asserts the trial court responded erroneously to a jury note asking whether the premeditation and deliberation necessary for first-degree murder could have occurred during (rather than before) the altercation that resulted in the homicide. We reject appellants' several claims and affirm their convictions.

## I.

Ewing and Dunn were accused of murdering 52–year–old Dorothy Evans. Her body, partially buried under a paint-spattered pile of trash, clothes, and other debris, was discovered by firefighters in the kitchen of her apartment early on the morning of April 17, 2003. The apartment was filled with smoke when the firefighters arrived, and it appeared to have been ransacked. An arson investigator found evidence that two separate fires had been set—one in the pile of debris covering the decedent's body, and the other in the hallway of the apartment. Empty paint cans were found on the scene, and the investigator inferred that whoever set the fires had tried to use the paint as an accelerant. In a subsequent search of the apartment for the weapon used to kill Evans, police recovered a small, heavy, metal barbell.

Evans was five feet, seven inches tall and weighed 102 pounds at the time of her death. In the opinion of the medical examiner who testified at trial, Evans died from multiple blunt impact injuries to her head, neck, and torso: She sustained a fractured skull, numerous lacerations, contusions, and abrasions, internal hemorrhaging, ten fractured ribs, and a punctured lung. Evans's head injuries were caused by at least six and perhaps as many as twelve blows. A heavy object of some kind must have been used to fracture her skull. Most, if not all, of these injuries preceded her death. There also were burns, some of them severe, on Evans's body, but the lack of any vital reaction to them implied that they occurred at or after the time of death.

The prosecution relied on incriminating statements and behavior on the part of appellants to connect them to Evans's murder and the fires in her apartment. In the interest of brevity, we may summarize the heart of that evidence as follows. Angela Jenkins testified that, on the night of the homicide, she was with Ewing and Dunn in "Ms. Tula's" apartment, which was two floors below Evans's apartment. The three of them were getting "high" when Evans knocked on the door. Dunn reacted, saying "I'll get it. I told that bitch not to knock." She and Ewing went to the door together and left the apartment with Evans. Afterward, Jenkins heard thumping and banging coming from Evans's apartment on the third floor. Jenkins said it sounded like a fight. The banging lasted for some ten to twenty minutes.[2] After it ended, Jenkins testified, Dunn and Ewing returned to Tula's

---

1. The jury acquitted appellants of first-degree felony murder, burglary, and attempted robbery.

2. Jeff Kingsbury, an upstairs neighbor, testified that he also heard the banging in Evans's apartment.

apartment and went into the kitchen, where they smoked cigarettes and engaged in a conversation.

Thereafter, Jenkins saw Dunn and Ewing leave and return to Tula's apartment several times in the next few hours, once with some sort of plastic covering on their feet and hands. Sometimes they were in the company of two other men, Michael Smith and Michael Young.[3] Jenkins noticed that Dunn had a bloody scratch on her face, and that Ewing was bleeding from his stomach. At one point, Dunn removed a rusty ice pick from her pants. The ice pick appeared to have blood on it. Jenkins previously had seen the ice pick in Tula's kitchen. At that time, there was no blood on it. (Evans's body bore no puncture wounds or other signs that she had been stabbed with the ice pick.) Ewing washed the blood off the ice pick with some bleach. He also used the bleach to clean up blood that had dripped onto the floor from his stomach injury.

Later, Jenkins saw Ewing and Smith carry a gallon of paint out of Tula's apartment. Ewing returned with black soot on his forehead. Young, who was with him at that time, had blood and paint on his clothes. Dunn had paint on her hands, which she tried to clean off with fingernail polish remover. After the fire alarm went off, Ewing stripped off his outer clothes and put them in a bag he obtained from Tula. Ewing also tried to convince Jenkins to ignore the fire, telling her that the smell of burning was coming from Tula's stove and that the fire alarm was coming from an ice cream truck. When Jenkins continued to wonder about the smell of fire in Tula's apartment, Ewing told her she asked too many questions.

After the firefighters arrived, Ewing and Dunn went to the nearby apartment of Wanda Crawford. Crawford testified that she observed blood on Ewing's hands and pants and an apparently fresh scratch on Dunn's face. She asked Dunn what had happened. Dunn responded by saying, "Damn Ms. Dot. She swung on me, and I had to hit her ass back. I had to beat her ass down, and I knocked her on the floor."[4] Dunn asked Crawford to hold a bag of her clothing; Crawford saw the clothing was stained with blood and paint.[5] A little later, when Ewing heard Crawford say she had learned from the firefighters that Evans was dead, he responded, "Fuck that bitch. Everybody got to die." Ewing subsequently told Crawford that Evans had owed him money.

Two other witnesses testified to admissions by Dunn and Ewing. According to Denise Brown–Robinson, Dunn tearfully told her that "they" had not meant to kill Evans, but that Evans had "fought back," and that her death was an accident.[6] And Diego Pryor recounted a jailhouse conversation in which Ewing asked him whether he had "hear[d] about the lady that got killed around Lincoln Heights." Ewing described her to Pryor as a "strong" old lady in her fifties or sixties and said she had some checks and money orders. Ewing told Pryor that a "dumbbell" was used to kill the old lady.[7]

Neither appellant presented evidence at trial. Their defense was a general denial

---

3. Smith and Young were initially co-defendants, but their cases were severed.

4. "Dot" was Dorothy Evans's nickname.

5. Crawford testified that she accepted the bag, but that it later was discarded.

6. Brown–Robinson also testified that she overheard Ewing threaten Smith to discourage him from snitching.

7. Ewing also told Pryor "his shirt was off" (when he committed the crime, apparently) and that "he was going to beat the case because the government didn't have any DNA evidence."

of any involvement in the murder of Evans; in closing arguments, defense counsel attacked the credibility of the prosecution witnesses and argued reasonable doubt.

## II. Sufficiency of the Evidence of Premeditation and Deliberation

In evaluating the sufficiency of the evidence to support a conviction, "we must view it in the light most favorable to the government, giving full play to the jury's right to determine credibility, weigh the evidence, and draw justifiable inferences of fact. The prosecution need not negate every possible inference of innocence. The key point is that the verdict cannot rest on mere speculation; we must be satisfied that there was some evidence on which a reasonable jury really could find the essential elements of the offense, including the essential *mens rea*, beyond a reasonable doubt." [8] The evidence "must be sufficient to persuade, not *compel*, a reasonable juror to a finding of guilty." [9]

The crime of first-degree premeditated murder is murder committed with the specific intent to kill after premeditation and deliberation. [10] Premeditation means the defendant "formed the specific intent to kill the victim for some length of time, however short, before the murderous act." [11] Deliberation means the defendant "acted with consideration and reflection upon the preconceived design to kill." [12] It is this "reflection and consideration, and not lapse of time" *per se* that is "determinative of deliberation" [13] (though time may furnish the opportunity to deliberate). For that reason, this court has stated that premeditation and deliberation may take place in a short span of time— even "as brief as a few seconds." [14] But for a conviction of first-degree premeditated murder to stand, the evidence must enable the jury to find that "the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity." [15] A finding of the required *mens rea* may, and usually must, be inferred from the facts and circumstances surrounding the homicide. [16]

We conclude that the jury permissibly could draw that inference in this case. Dunn argues that the jury had no eyewitness account of what happened inside Evans's apartment, and that "[t]he violence and multiple wounds [inflicted on Evans], while more than ample to show an intent to kill, cannot standing alone support an inference of a calmly calculated plan to kill requisite for premeditation and deliberation, as contrasted with an impulsive and senseless, albeit sustained, frenzy." [17] But this argument minimizes the

8. *Kitt v. United States*, 904 A.2d 348, 354 n. 5 (D.C.2006) (internal citations omitted).

9. *Watson v. United States*, 501 A.2d 791, 793 (D.C.1985).

10. *Kitt*, 904 A.2d at 353.

11. *Id.* (internal quotation marks omitted); *see also, e.g., Castillo–Campos v. United States*, 987 A.2d 476, 485 (D.C.2010) ("[T]he government must show that the defendant, before acting, gave thought to the idea of taking a human life and reached a definite decision to kill.") (internal quotation marks omitted).

12. *Castillo–Campos*, 987 A.2d at 485 (internal quotation marks omitted).

13. *Watson*, 501 A.2d at 793.

14. *Id.*

15. *Kitt*, 904 A.2d at 353 (internal quotation marks omitted); *see also Watson*, 501 A.2d at 792 ("First degree murder is a calculated and planned killing while second degree murder is unplanned or impulsive.").

16. *See Castillo–Campos*, 987 A.2d at 486.

17. *Austin v. United States*, 127 U.S.App.D.C. 180, 190, 382 F.2d 129, 139 (1967), *overruled on other grounds by United States v. Foster*, 251 U.S.App.D.C. 267, 783 F.2d 1082 (1986).

totality of the evidence and what the jury reasonably could find it implied. The jury could find that Ewing and Dunn, acting in concert, escorted Evans away from Tula's apartment and up two flights of stairs to her own apartment, where they could confront her in secret.[18] There evidently was pre-existing hostility between appellants and Evans—as indicated by Dunn's remark when "that bitch" knocked on the door and Ewing's comment that Evans owed him money—and before leaving Tula's apartment with Evans, Dunn apparently thought to arm herself with a deadly weapon, the ice pick.[19] There was ample evidence (e.g., Ewing's subsequent statements, the ransacked condition of the apartment) that appellants intended to extract money from Evans by force. If so, she evidently balked at their demands. Ewing and Dunn ganged up on the diminutive woman and administered a brutal and prolonged beating. In the course of this murderous assault, one of the appellants grabbed a heavy metal barbell and bludgeoned Evans with it repeatedly. Evans may have fought back with surprising force, injuring both Ewing and Dunn,[20] but the jury readily could find that her desperate resistance was futile, and that appellants always had the upper hand and went well beyond merely trying to subdue their victim. And after taking Evans's life, the

jury could find, appellants ransacked her apartment in search of money and other valuables and then returned to Tula's apartment to smoke cigarettes and talk.[21]

During its deliberations, the jury sent a note inquiring whether it permissibly could find that the premeditation and deliberation required for first-degree murder occurred during the beating that resulted in Evans's death. That inquiry, which we discuss further below, indicates that the jury gave careful attention to whether the government proved premeditation and deliberation. The jury ultimately found the proof sufficient and was persuaded by it. We owe deference to that determination. From the totality of the evidence we have just summarized, we think the jury fairly and reasonably could draw the necessary inference and find that Evans's assailants did not murder her impulsively or in the heat of passion. Rather, the jury could conclude that appellants anticipated using violence against Evans and, angered by her refusal to comply with their demand for money, reached a definite decision inside her apartment to kill her in order to achieve their ends. That was premeditation. And given the character and extended duration of the beating that ensued, and appellants' behavior immediately after it, the jury could conclude that appellants'

18. Cf. Busey v. United States, 747 A.2d 1153, 1161 (D.C.2000) (evidence of mens rea for first-degree murder included fact that killer said he wanted to speak to victim alone before entering room and closing door behind him).

19. Cf. Jones v. United States, 477 A.2d 231, 247 (D.C.1984) (finding sufficient evidence of premeditation and deliberation where defendant, angry over victim's refusal to "give him his money," procured a gun and then forced her to go to his apartment; the fact "[t]hat he rejoined Ms. Nicks armed with a loaded working pistol permits the inference that he ordered her into the apartment with a calculated intent to kill").

20. From Ewing's stomach wound and the presence of blood on the ice pick, the jury could have inferred that Dunn tried to use the pick against Evans, and that Ewing was stabbed with it during the struggle when Evans either wrested it away from Dunn or deflected it.

21. See Mills v. United States, 599 A.2d 775, 782 & n. 6 (D.C.1991) (noting that defendant's subsequent actions may help establish mens rea for first-degree murder, "when they reflect a prior state of mind, particularly where they are fairly recent and in some significant way connected with prior material events") (internal quotation marks omitted).

intent to kill Evans "persist[ed] long enough and in such a way as to permit that intent to become the subject of a further reflection and weighing of consequences and hence to take on the character of a murder executed without compunction and 'in cold blood.' " [22] That was deliberation. The evidence did not necessarily *compel* the jury to reach those conclusions and find appellants guilty of first-degree murder, but it *permitted* the jury to do so without engaging in impermissible speculation.

### III. The Jury Instruction on Aiding and Abetting

 Invoking the principles enunciated by this court in *Wilson–Bey v. United States*,[23] appellant Dunn argues that the trial court's general instruction on aiding and abetting was constitutionally inadequate because it permitted the jury to find her guilty as an accomplice to first-degree premeditated murder without finding that she possessed the *mens rea* required to commit that offense—specifically, without

finding that she participated in Evans's killing with premeditation and deliberation. For the reasons that follow, we are not persuaded by this contention.[24]

Appellants' trial was held a few months before *Wilson–Bey* was decided, but the parties and the trial court were aware of that case, and the court prudently agreed to excise the language in the then-standard aiding-and-abetting instruction that *Wilson–Bey* subsequently disapproved. Thus, the court here *did not* instruct the jury on the "natural and probable consequences" theory of accomplice liability.[25] Consistent with *Wilson–Bey*, the court instructed that in order to find a defendant guilty of a particular charged crime as an aider and abettor, the jury would have to find that the defendant "knowingly associated himself or herself with the persons who committed the crime, ... participated in the crime as something he or she wished to bring about[,] and ... intended by his or her actions to make it succeed." [26] Dunn's counsel urged the court to add that "it is

---

**22.** *Austin,* 127 U.S.App.D.C. at 188, 382 F.2d at 137; *see also, e.g., Fortson v. United States,* 979 A.2d 643, 656 (D.C.2009) ("While a passerby possibly would have characterized the kicking and stomping of Whitfield as 'frenzied,' " evidence allowed a finding that the defendant had "ample time to reflect on his actions and ample time for any initial rage ... to peter out," and thus had acted with premeditation and deliberation), *reh'g granted and op. modified,* 987 A.2d 1118 (D.C.2010).

**23.** 903 A.2d 818, 830 (D.C.2006) (en banc) (holding, *inter alia,* that "conviction of first-degree premeditated murder on an aiding and abetting theory requires the prosecution to prove that the accomplice acted with premeditation and deliberation and intent to kill").

**24.** Our review of appellant's claim is *de novo. Id.* at 827.

**25.** Specifically, the court omitted the paragraph of the then-standard instruction that read as follows:

It is not necessary that the defendant have had the same intent that the principal of-

fender had when the crime was committed, or that s/he have intended to commit the particular crime committed by the principal offender. An aider and abettor is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which s/he intentionally participates.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Instruction No. 4.02 (2002 Supp.). *Wilson–Bey* disapproved this portion of the pattern instruction because it unconstitutionally allowed conviction of a defendant as an aider and abettor *without* proof that the defendant possessed the *mens rea* necessary to commit the charged offense. 903 A.2d at 845.

**26.** This language, which *Wilson–Bey* approved, 903 A.2d at 831, 835, continues to appear in the pattern instruction on aiding and abetting liability. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Instruction No. 3.200 (2010 Supp.).

necessary that the aider and abettor have the same intent as the principal offender," but the court declined to make that further change in the basic instruction.

The aiding-and-abetting instruction given here was a general instruction; it does not address accomplice liability for the offense of first-degree premeditated murder specifically. As applied to that offense, it may be argued that the instruction is somewhat ambiguous. By stating that the alleged accomplice to a premeditated homicide must have acted with the wish and intent to bring about the crime, the instruction adequately conveys that the accomplice had to act with the specific intent to kill.[27] But it does not necessarily follow from this that the accomplice must have formed and acted on that intent after premeditation and deliberation. Even if the principal perpetrator premeditated and deliberated the killing, an accomplice may intend to help the principal commit the homicide without actually having premeditated and deliberated herself.[28] Dunn argues that the additional language she requested was necessary to ensure that the jury did not find her guilty of first-degree premeditated murder as an aider and abettor without finding that she herself acted with premeditation and deliberation.[29]

▇▇ Where a jury instruction in a given case is arguably ambiguous, and one of the possible meanings is unconstitutional, our inquiry is whether there exists a "reasonable likelihood"—not merely a possibility—that the jurors in the case actually applied the instruction in a way that violated the Constitution.[30] In determining whether such a reasonable likelihood exists, the challenged instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record," [31] including the evidence and the arguments of counsel.[32]

---

27. See Paige v. United States, 25 A.3d 74, 89 (D.C.2011) ("[W]here the jury was properly instructed on the elements of second-degree murder and intent, the failure to expressly inform the jury that an aider and abettor must possess the same mens rea as the principal was not plain error.") (internal quotation marks omitted); Fox v. United States, 11 A.3d 1282, 1288–89 (D.C.2011) (similarly finding no plain error where appellant was convicted of armed robbery as an aider and abettor); Appleton v. United States, 983 A.2d 970, 978 (D.C.2009) (perceiving "no reason" why the instruction in question "would allow a jury to convict a defendant [of assault with intent to kill and other specific intent offenses] under an aiding and abetting theory without finding that he had the required mens rea ").

28. See Wilson–Bey, 903 A.2d at 836. Recognizing this, the drafters of the current standard instruction on aiding and abetting liability recommend instructing the jury that, when the charged offense is first-degree premeditated murder, the government must prove the defendant personally acted with premeditation, deliberation, and the specific intent to kill, regardless of whether the defendant was the principal offender or an aider and abettor. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Instruction No. 3.200 cmt. (2010 Supp.). We endorse this recommendation as a means of avoiding the risk of jury confusion.

29. We pause to observe that the language Dunn requested did not clarify the need to find premeditation and deliberation on the part of the aider and abettor. Dunn did not alert the trial court to that precise concern. The government does not argue, however, that Dunn failed to preserve the claim she makes on appeal.

30. See Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994); Boyde v. California, 494 U.S. 370, 379–81, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); Hatch v. United States, 2011 WL 6090084, at *5 n. 16, 2011 D.C.App. LEXIS 682, at *16 n. 16 (D.C. Dec. 8, 2011); Blaine v. United States, 18 A.3d 766, 774–75 (D.C.2011).

31. Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (internal quotation marks omitted).

32. Cf. Boyde, 494 U.S. at 384, 110 S.Ct. 1190 (acknowledging that while "arguments of counsel generally carry less weight with a

We perceive no reasonable likelihood that the jury in this case unconstitutionally misapplied the aiding and abetting instruction. The court never suggested that the jury could dispense with the inquiry into premeditation and deliberation with respect to either defendant. In instructing the jury on the elements of first-degree premeditated murder, the court took care to state that the government had to prove "that the defendants caused the death of Dorothy Evans, that *they* did so with a specific intent to kill [Evans,] that *they* did so ... after premeditation [and] that *they* did so after deliberation." (Emphasis added.) [33] Thereafter, immediately before instructing the jury on aiding and abetting liability, the court discussed how the jury might ascertain whether "the defendants acted with the necessary state of mind":

> You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts knowingly done.... You should consider all of the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that the defendants acted with the necessary state of mind.[34]

The court thus distinguished a defendant's "acts" from his or her intent and state of mind. The court continued in that vein as it then proceeded to instruct on aiding and abetting:

> You may find the defendant guilty of the crimes charged in these indictments without finding that he or she personally committed each of the *acts* that make up the crime or that he or she was present while the crime was being committed. Any person who in some way intentionally participates in the commission of a crime aids and abets the principal offender. He or she is, therefore, as guilty of the crime as he would be if he had personally committed each of the facts [*sic* [35]] that make up the crime.

> To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself or herself with the persons who committed the crime, that he or she participated in the crime as something he or she wished to bring about and that [he] or she intended by his or her actions to make it succeed.

> Some affirmative conduct by the defendant to help in planning or carrying out the crime is necessary....

> \* \* \* \*

> It is sufficient if you find beyond a reasonable doubt that the crime was

jury than do instructions from the court," in some circumstances they may have a "decisive effect on the jury").

**33.** In addition, when the court instructed the jury on the lesser-included offense of second-degree murder, it reiterated the government's burden to prove that *"they* [the defendants] had the specific intent to kill or seriously injure the decedent or acted in a conscious disregard of an extreme risk of death or serious bodily injury to the decedent." (Emphasis added.)

**34.** We specifically have approved this permissive-inference instruction, which advises the jury that it may infer a person's state of mind from the foreseeable consequences of his own deeds. *See Walden v. United States,* 19 A.3d 346, 348–50 (D.C.2011). That instruction is *not* to be confused with the "natural and probable consequences" instruction disapproved in *Wilson–Bey,* which told the jury that an accomplice is liable for an offense committed by the principal if it was a foreseeable consequence of the crime in which the accomplice intentionally participated, even if the accomplice lacked the requisite *mens rea* to commit the offense.

**35.** The pattern instruction says "acts," not "facts." The court undoubtedly meant to say "acts," and "facts" may be an error of transcription. In any event, we cannot imagine that inadvertent use of the word "facts" could have confused the jury.

committed by someone and that a defendant knowingly and intentionally aided and abetted the principal offender in committing the crime. (Emphasis added.)

In context, the thrust of this instruction is simply that an accomplice may be guilty without having performed all the physical actions necessary to complete the charged offense—*not* that an accomplice may be guilty without having the requisite mental state for that offense.

The prosecutor reinforced that distinction in her summation. She argued that Ewing and Dunn each had the specific intent to kill Evans, and that "[t]hey did so after premeditation, they did so after deliberation." The prosecutor relied on the aiding and abetting instruction only to argue that it did not matter which defendant struck the fatal blow, inasmuch as they both joined in the beating with the required intent.[36] The prosecutor never implied that the jury could find either defendant guilty as an accomplice to first-degree premeditated murder without finding that the defendant had the *mens rea* needed to commit the offense.

For its part, the jury inquired whether it could infer that the necessary premeditation and deliberation occurred during the beating that resulted in Evans's death. This inquiry, which we discuss in detail in the next section of this opinion, shows that the jury focused on the *mens rea* requirement of first-degree murder. There is no sign the jury thought the aiding-and-abet-

ting instruction allowed it to disregard that requirement.

We therefore are satisfied there is no reasonable likelihood that the jury in this case applied the aiding-and-abetting instruction in a way that violated the Constitution, i.e., by exempting the government from its burden of proving that Dunn and Ewing each premeditated and deliberated over killing Evans.

## IV. The Jury Note

During its deliberations, the jury sent a note to the court asking, "Under the law, does premeditation require [*sic*] 'before the act commences'? Can you go through premeditation and deliberation during the act (in this case during the beating)?"[37] The court discussed with the parties how to respond to this query. Appellant Ewing urged the court to re-instruct the jury on the meaning of premeditation and deliberation, emphasize the need for proof ("some sort of testimony or some sort of evidence") to support any finding that a defendant premeditated and deliberated during the beating, and tell the jury that premeditation and deliberation had to take place "before the commission of the fatal act." Ultimately, the court chose to respond to the note more concisely. Accepting part of Ewing's proposal, the court instructed the jury that premeditation and deliberation could occur "during the beating," but "you must find that it occurred before the killing." In addition, in lieu of

**36.** Thus, the prosecutor argued:

Can we prove to you which blows David Ewing struck? Absolutely not. Can we prove to you which blows Ms. Dunn struck? Absolutely not.... But one of the things you have to consider with the first-degree premeditated murder count is this, that instruction that Judge Christian gave you on aiding and abetting.... [T]his woman stood no chance, two against one, with both David Ewing beating her with that barbell and with Gloria Dunn beating her down to

the ground, that's acting together. That's aiding and abetting one another.... No, it's impossible to tell which blows, where was the decision made, which ones, but on this evidence ... the extent of the injuries tell you whether these two defendants meant to kill her.

**37.** In a second note, the jury clarified that "[b]y 'the act,' we mean the beating of Ms. Dorothy Evans that resulted in her death."

re-instructing on the meaning of the terms, the court recommended that the jury review the instructions previously provided on premeditation and deliberation.

Ewing now argues that the court erred by declining to tell the jury explicitly that "there must be evidence" of premeditation and deliberation. Absent that admonition, Ewing asserts, the re-instruction invited the jury "to fill in the gaps via speculation, since there was no actual evidence that there was premeditation and deliberation" during appellants' altercation with Evans.[38]

 To the extent Ewing is arguing that the government's proof did not justify a finding of premeditation and deliberation during the beating inflicted on Evans, we have rejected that argument in our discussion of the sufficiency of the evidence. Alternatively, if Ewing is arguing that the court abused its discretion by not reminding the jury of the need for evidence to support its determination, we are unpersuaded. "[W]hen a jury sends a note indicating its confusion with the law governing its deliberations, the trial court must not allow that confusion to persist; it must respond appropriately" and dispel the jury's difficulties with "concrete accuracy."[39] By responding directly to the jury's inquiry, the re-instruction in this case fulfilled that goal. The jury evinced no confusion about the need to base its findings on the evidence, nor any inclination to indulge in undue speculation. As the court's prior instructions had made the jury well aware of the necessity for proof beyond a reasonable doubt of each element of the offense, including premeditation and deliberation, we cannot say the court abused its discretion.

## V. Merger Issues

As appellant Dunn contends and the government agrees, her convictions for first-degree premeditated murder and second-degree murder should merge, because both offenses concern the same homicide.[40] (The same is true for Ewing's convictions of those two offenses.) Because we find no flaw in the first-degree murder convictions, we will direct that the second-degree murder convictions be vacated on remand.

 Dunn also argues that her two arson convictions merge.[41] With that contention we do not agree, for the evidence supported a finding by the jury that the two fires set by appellants in Evans's apartment constituted separate criminal acts subject to separate criminal punishment. "[C]riminal acts are considered separate when there is an appreciable length of time between the acts that constitute the two offenses, or when a subsequent criminal act was not the result of the original impulse, but a fresh one."[42] To determine whether there has been a fresh impulse, we consider whether "the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decide[d] to invade a different interest."[43]

38. Brief for Appellant Ewing at 19.

39. *Cox v. United States*, 999 A.2d 63, 70 (D.C. 2010) (internal quotation marks and citations omitted).

40. *See Thacker v. United States*, 599 A.2d 52, 63 (D.C.1991).

41. Dunn was sentenced to five years' imprisonment on each arson count, to run concurrently with one another but consecutively to her sentences on the other counts of conviction.

42. *Sanchez–Rengifo v. United States*, 815 A.2d 351, 355 (D.C.2002) (internal quotation marks omitted).

43. *Jenkins v. United States*, 980 A.2d 421, 424 (D.C.2009) (internal quotation marks omitted).

Here, the fire investigator testified that two fires were started in separate locations in Evans's apartment: one on the victim's body, which was found on the floor of the kitchen, and the other in the hallway. There was evidence the fires were started at different times: the jury could infer that appellants went back and forth between Tula's apartment and Evans's apartment to set the fires, and witnesses said the building fire alarm went off twice. The jury also could infer that the fires were set for different purposes: the first to obliterate evidence on the body of the victim, the second to destroy the entire apartment and any evidence that might have been located elsewhere inside it. In its entirety, this was enough to establish two separate offenses, precluding merger.[44]

## VI.

For the foregoing reasons, we affirm appellants' convictions and the judgments of the Superior Court.[45] We remand appellants' cases to the Superior Court with instructions to vacate their second-degree murder convictions, as those convictions merge with appellants' first-degree premeditated murder convictions.

*So ordered.*

---

44. *See, e.g., Gardner v. United States*, 698 A.2d 990, 1003 (D.C.1997) (holding that two separate incidents of rape were perpetrated against the same victim, where "an appreciable period of time" elapsed between the incidents, and intervening events occurred during the interim).

45. Pursuant to D.C.Code § 22–2104.01(b)(4) (2001), appellants were eligible for a sentencing enhancement (up to life without parole) upon a proper determination that the first-degree murder was "especially heinous, atrocious, or cruel." The jury so found. Appellant Dunn has argued that this aggravating circumstance is unconstitutionally vague, and that the trial court erred in submitting it to the jury instead of striking it from the indictment. Any error in that regard is harmless, however, and Dunn's claim is moot, because the court did not impose an enhanced sentence on either appellant.